No. 49,868

CITIZENS STATE BANK & TRUST COMPANY OF HIAWATHA, KANSAS, AS
CONSERVATOR FOR HELEN RELLER, *Plaintiff-Appellant*, v. LARRY
D. NOLTE, *Defendant-Appellee.*

(601 P.2d 1110)

Opinion filed October 27, 1979.

*John L. Weingart,* of Finley, Miller, Cashman, and Schuetz, of Hiawatha, and
*James M. Concannon,* of Topeka, argued the cause, and *Samuel L. Schuetz,* of
Finley, Miller, Cashman, and Schuetz, of Hiawatha, was with them on the brief
for the appellant.

*Olin K. Petefish* and *John J. Immel,* of Petefish, Curran, and Immel, of
Lawrence, argued the cause and were on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by a conservator to set
aside a deed to certain farmland, executed by the conservatee,
Helen M. Reller, to the defendant, Larry D. Nolte. The petition
further prays that the title to the real estate be quieted against the
defendant. The facts in the case are not complicated and essen-
tially are as follows: On September 19, 1972, the plaintiff, Citi-
zens State Bank and Trust Company of Hiawatha, was appointed
conservator for Harvey F. Reller and Helen M. Reller as a result
of voluntary petitions for conservatorship filed by the Rellers.
Harvey F. Reller died on July 14, 1974. At the time of the trial in
1977 Helen M. Reller was 83 years of age. Prior to the appoint-
ment of the bank as conservator and down to the present time,
Helen M. Reller was the owner of 400 acres of farmland in Brown
County. This property has been in her family since 1871, when it
was purchased by her grandfather. The defendant, Larry D.
Nolte, has been a life-long resident of Brown County and a close
friend of Harvey F. Reller and Helen M. Reller. Nolte was raised

and lived all of his life on a farm adjoining the Reller farm. The Rellers were a strong-willed, independent couple and until later years self-reliant. In 1967, Harvey F. Reller became ill and was operated on for a cancer. Thereafter, he was unable to perform his usual farm duties. The trial court, in its findings, found that those farm duties were performed by the defendant, Larry D. Nolte, willingly and without expecting compensation. The defendant shopped for the Rellers and ran errands for them and took Harvey to St. Joseph about twice a month for checkups. This continued until Harvey's death. Harvey, for a period, was placed in a nursing home. During that time, the defendant made daily visits and tended to Harvey's needs which included cleaning him and dressing him up. He also assisted Helen Reller with chores and shopping and visited her every day. After a time, Harvey Reller was able to return to his farm from the nursing home. The Rellers became concerned for their personal well being and support. They turned to their friend, Larry Nolte, and at the Rellers' request a contract was prepared under which the defendant agreed to care for the Rellers during their lifetime and support them. In consideration thereof, the Rellers agreed to execute a deed conveying to defendant Nolte the 400 acres of land which stood in the name of Helen M. Reller. By the terms of the contract, the deed was placed in escrow with William L. Stevenson, an attorney, of Hiawatha, Kansas, to be delivered to Larry D. Nolte at the death of the survivor of Harvey F. Reller and Helen M. Reller. Both deed and contract were dated December 7, 1973, at which time there was in existence the voluntary conservatorship created on September 19, 1972. At the time the contract was entered into, Larry D. Nolte knew of the conservatorship for the Rellers at the Citizens State Bank and had had knowledge thereof since the day it was initiated.

After Harvey Reller's death, the defendant, Nolte, had another contract and deed prepared by his attorney in Lawrence, Kansas. This contract and deed were signed by Helen M. Reller on November 13, 1974. The contract terminated the contract previously entered into between Nolte and Harvey and Helen Reller on December 7, 1973. Under the terms of the new contract, Nolte agreed to provide care and services to Helen M. Reller until her death should her financial resources be depleted to the extent that she could not provide herself with the financial requirements of

life. Nolte further agreed to pay the expenses of her last illness and funeral, if her estate was insufficient. In consideration of Nolte's services, Helen Reller executed and delivered to Nolte a warranty deed conveying to him a remainder interest to the 400 acres of farmland, reserving in herself a life estate with full rights of possession, occupancy, and income until her death.

From the record it appears that certain relatives of Helen M. Reller became concerned about her attachment to Larry D. Nolte and took steps to prevent Larry Nolte from visiting Helen Reller. Apparently, Larry Nolte intended to hold the deed to the 400 acres of Reller property until Mrs. Reller died. However, he changed his mind after Mrs. Reller was hospitalized in 1976. On November 10, 1976, Nolte filed the deed for record in Brown County. Prior to this time the conservator, Citizens State Bank, had no knowledge of the deed. On November 22, 1976, the Citizens State Bank, as conservator for Helen M. Reller, filed an action to set aside the deed and to quiet Helen Reller's title in the 400 acres. In its petition, the conservator alleged that the deed should be set aside for the following reasons: (1) When it was signed on November 13, 1974, the plaintiff was conservator for Helen M. Reller and at no time did she have any intent to convey any interest in the real estate to the defendant; (2) that there was no consideration given for the deed; (3) that Helen M. Reller did not acknowledge the deed before a notary public; and (4) that duress, undue influence, fraud, and misrepresentation were used by the defendant to obtain Helen Reller's signature to the deed. In his answer to the petition, defendant Nolte admitted that letters of conservatorship were issued to the Citizens State Bank by the Brown County Probate Court on September 19, 1972. He admitted that Helen M. Reller had been the owner of the real estate until she conveyed it to the defendant. By his general denial, defendant denied there was any want of consideration, duress, undue influence, fraud, or misrepresentation, and further denied that Helen M. Reller did not intend to convey any interest in the real estate to the defendant. Thereafter, the plaintiff bank moved the court for summary judgment. In its motion, the bank argued, in substance, that the contract and deed executed by Helen M. Reller were void and of no legal effect, because, at the time they were executed, Helen Reller was a conservatee and could not, as a matter of law, make an *inter vivos* conveyance or

create a charge on her property without the consent of her conservator. The defendant opposed the motion on the basis that a decision should not be made on that legal issue until there had been a complete presentation of the facts. The trial court, in its memorandum decision, overruled the motion for summary judgment on the basis that there appeared to be some unresolved factual issues "that may or may not be material" and set the case for trial. Thereafter the case was fully tried on the merits in a hotly contested trial.

The trial court entered judgment in favor of defendant Nolte, finding that the deed and contract were valid and binding. Specifically, the trial court found that Helen Reller was mentally competent and aware of legal procedures in executing the deed and contract which were the subject of the lawsuit. The court further found that there was adequate consideration for the deed and contract and that the defendant did not unduly influence Helen Reller in their execution. Following entry of judgment in favor of defendant Nolte, the plaintiff, Citizens State Bank, appealed to this court.

The plaintiff conservator has raised four basic points on the appeal. The first point presents a question of law: Whether a conservatee under a voluntary conservatorship, who is neither a minor nor an "incapacitated person" within the meaning of K.S.A. 59-3002(1), has the capacity to contract and make an *inter vivos* disposition of conservatorship assets without the knowledge or consent of either the conservator or a court of proper jurisdiction. The other three points challenge the sufficiency of the evidence to support the findings of the trial court and allege trial errors in the admission of certain testimony. If the plaintiff conservator is correct on the first point presented, it is not necessary for this court to consider the remaining points.

Stated in simple language, the question of law presented for our determination in this case is whether the imposition of the voluntary conservatorship without a finding of incapacity, deprived the conservatee, Helen Reller, of her capacity to contract and convey away her real property by deed during the existence of the conservatorship. This is the same basic issue raised in the plaintiff's motion for summary judgment and renewed by motion after all of the evidence was presented. The trial court held that Helen M. Reller, as a voluntary conservatee, had such capacity

and upheld the contract and deed. We have concluded that the district court was in error and that the question presented must be answered in the affirmative. In arriving at this conclusion, we have carefully considered the Kansas statutes pertaining to conservatorships. It would be helpful to review those statutes which are pertinent to the issue presented in this case. The "act for obtaining a guardian or conservator" may be found at K.S.A. 59-3001 *et seq.* K.S.A. 59-3002 defines the term "conservator" to mean any person who has been appointed by a court of competent jurisdiction to exercise *control* over the estate of any person. The term "conservatee" is defined as a person who has a conservator. Section 59-3006 provides that a conservator may be appointed for an incapacitated person, a minor, and an adult who has made application pursuant to K.S.A. 59-3007.

K.S.A. 59-3007 provides for the appointment of a conservator on the voluntary application of any adult person who is neither an adjudged incapacitated person nor is a proposed ward or proposed conservatee. That section requires the court to make a determination that there is a *need* for the appointment of a conservator. K.S.A. 59-3008 prescribes the procedure to be followed in the creation of a voluntary conservatorship. K.S.A. 59-3019 prescribes the rights and duties of a conservator. That section vests in the conservator broad powers to possess and manage the estate of the conservatee, to invest the conservatee's funds, to pay his debts, and pay reasonable charges for his support and maintenance. The title to real property acquired by the conservator is in all cases to be taken in the name of the conservatee. Under K.S.A. 59-3021, the conservator is given the power to lease any real estate of his conservatee for a period of three years or less. K.S.A. 59-3022 grants the conservator the power to sell or lease property for more than three years subject to the approval of the court. K.S.A. 59-3028 provides that a voluntary conservatorship shall terminate (1) upon an order of the court finding that there is no further need for a conservatorship; (2) upon the death of the conservatee; (3) upon the finding that the conservatee is an adjudged incapacitated person; and (4) upon the filing of a verified application by a conservatee that he or she no longer desires to have the conservatorship continued.

It is clear from a careful analysis of the statutes cited above that a voluntary conservatorship may be created even though the

conservatee has not been adjudged incapacitated or incapable of handling his own affairs. The question then naturally arises whether a voluntary conservatee, not having been adjudged incapacitated, may enter into contracts or convey his property by deed *inter vivos* or dispose of it by testamentary disposition. That question is answered in part in *Union National Bank of Wichita v. Mayberry*, 216 Kan. 757, 533 P.2d 1303 (1975). In *Mayberry*, the decedent, Marie Pierce, had purchased United States Savings Bonds, Series H. The bonds were registered in her name, as owner, and were by her initially made payable on death to her sister, Emma Scruggs. Emma Scruggs died in 1963. In 1971, Mrs. Pierce, then a seventy-eight-year-old widow, was physically injured in an automobile accident which resulted in her hospitalization. On August 10, 1971, a voluntary conservatorship was established for her pursuant to K.S.A. 1974 Supp. 59-3007. The court's order, which named the First National Bank of Wichita as conservator, expressly found that Mrs. Pierce was neither an adjudged incapacitated person nor an incompetent person. Upon this appointment, the First National Bank took possession of all of Mrs. Pierce's property including the bonds in question. In September 1971, Mrs. Pierce went to the bank and, with the assistance of a bank official in the trust department, obtained a change of the POD designee from Emma Scruggs to Clara Mayberry, Mrs. Pierce's sister. The bonds were not cashed but were reissued in the name of Marie Pierce, as owner, with Clara Mayberry as POD beneficiary. The conservator did not obtain a probate court order authorizing or approving the change or the release of the bonds to Mrs. Pierce.

On September 14, 1972, the probate court, on a petition for involuntary conservatorship, found that Mrs. Pierce was then an incapacitated person and appointed Clara Mayberry as guardian of her person and the First National Bank as conservator of her estate. On March 31, 1973, Marie Pierce died intestate. The Union National Bank of Wichita was appointed administrator of her estate. The administrator bank then brought an action against Clara Mayberry to determine the ownership of the bonds in question. In *Mayberry*, this court held the fact that the decedent was under a voluntary conservatorship and that prior approval or authority had not been obtained from the probate court, did not void the change in the POD designee. In the course of the

opinion, the court discusses the pertinent statutes. It is pointed out that the procedure providing for a voluntary conservatorship was enacted to make it possible for a mentally competent adult, who has some physical condition or disability rendering the handling of his property difficult or impossible, to voluntarily apply to the probate court for the appointment of a conservator thus avoiding the stigma of having a "guardian" or being adjudged an incompetent or incapacitated person. The court points out that, euphemistically, this may be of significance to the individual affected, although the functions of the conservator may be identical to those of a guardian under the former law.

In *Mayberry,* it is stated that a conservator has the duty to take charge of the conservatee's estate and manage and conserve it for the support of the conservatee. The conservator's duty, however, is to manage the estate during the conservatee's lifetime. It is not his function, nor that of the probate court supervising the conservatorship, to control disposition of the conservatee's property after death. The court concluded that the execution of a will by the conservatee did not interfere with the conservator's function. In *Mayberry,* the court clearly makes a distinction between testamentary dispositions by a voluntary conservatee and *inter vivos* transfers which diminish the conservatee's estate during his lifetime. *Mayberry,* of course, did not involve an *inter vivos* contract or conveyance affecting real property executed without the knowledge or consent of the conservator. Thus the issue presented in this case was not reached in *Mayberry* and is at this time a novel question in this state.

Cases from other jurisdictions are not in agreement on the issue presented. Variations in the decisions depend to some extent on the specific state statutes involved, some of which vest more power and control in the voluntary conservatee than is provided for under the statutes of other states. In this case, the defendant, Larry D. Nolte, relies primarily on *Board of Regents of State Univ., St. of Wis. v. Davis,* 14 Cal. 3d 33, 120 Cal. Rptr. 407, 533 P.2d 1047 (1975). The question presented in *Davis* was whether the imposition of a conservatorship without a finding of incompetency deprived the conservatee of the capacity to contract. The California Supreme Court held that, under the applicable California statutes, it did not. In arriving at this decision, the California court emphasized that the language of the California

statutes required such a result. It is pointed out in the opinion that a California statute provided that the conservator is required to pay any debts incurred by the conservatee *after the creation of the conservatorship,* except that ability of the conservator to continue to provide the conservatee with the necessities of life shall not be impaired. The conservator is also required to pay debts of the conservatee during the conservatorship, if they appear to be such as a reasonably prudent person might incur. Other California statutes provided that a conservatee, if employed, may retain complete control of his wages or salary, and, further, that a court, upon petition of the conservatee, may provide that the conservator pay the conservatee an allowance for the personal use of the conservatee, and the funds so paid to the conservatee shall be *subject to his sole control.* The court, in *Davis,* overruled the prior case of *Place v. Trent,* 27 Cal. App. 3d 526, 103 Cal. Rptr. 841 (1972), which had held that a voluntary conservatee, as a matter of law, lacks capacity to contract, even if the conservatee has not been adjudged incompetent. It should be noted that *Place v. Trent* was relied upon, at least to some extent, by this court in *Mayberry.*

The appellate courts in other jurisdictions, with statutes similar to ours and not having statutory provisions similar to those in California discussed above, have held that a conservatee under a voluntary conservatorship may not contract with respect to or make an *inter vivos* conveyance of his property without the authority of his conservator. See *Normandin v. Kimball,* 92 N.H. 62, 25 A.2d 39 (1942); *Morse v. Slocum,* 192 Iowa 1080, 186 N.W. 22 (1922); and *Foss v. Twenty-Five Associates,* 239 Mass. 295, 131 N.E. 798 (1921).

As noted above, we have concluded that a conservatee under a voluntary conservatorship cannot contract or deed away his property *inter vivos* without the prior approval of the conservator or, where required by statute, the approval of the district court. However, as established by *Mayberry,* he may make a testamentary disposition if the conservatee has testamentary capacity. In arriving at this conclusion, we are convinced that a contrary rule would defeat the primary purpose of the voluntary conservatorship statute to dignify old age by eliminating, in many instances, the stigma of having the elderly person declared incapacitated or incompetent. Incapacity is a matter of degree. As all of us grow

older, we gradually lose our faculties, both physical and mental. The longer we live and the older we become, the more we lose. If a voluntary conservatee, not mentally incapacitated, were to be given an unbridled power to contract or deed away his property *inter vivos*, the voluntary conservatorship would seldom be used, because the relatives of the elderly person, seeking to protect the loved one from his or her own actions, would of necessity, utilize the compulsory conservatorship procedure. Hence, the old folks would in most instances be required to spend their golden years branded as "incapacitated" or "incompetent."

It also appears to us that, if a voluntary conservatee were given the power in his discretion to dispose of his property *inter vivos*, it is doubtful that any person would want to accept the position of conservator, since such a conservator, although given responsibilities and duties, would really have no control over the estate of his conservatee. This would be an extremely difficult, if not an impossible situation. We also note that such a holding would create a judicial exception, diminishing the broad powers of a conservator to control and manage the conservatorship assets provided for under the Kansas statutes. The Kansas legislature has not specifically granted a voluntary conservatee the power to contract or to incur debts while the conservatorship is in existence as is provided by the California statutes. If the legislature desires to make such an exception, it may do so.

We have also concluded that there is no need for such a rule. We note that, under K.S.A. 59-3028, a voluntary conservatorship may be terminated by the mere filing of a verified application by the conservatee that he or she no longer desires to have the conservatorship continued. If the voluntary conservatee really wants to convey his property and is opposed by an uncooperative conservator, the conservatee may go to court and have the voluntary conservatorship terminated. Furthermore, an elderly person, who does not like the rule that we have adopted today, may execute an appropriate power of attorney so that he may have assistance in the management of his affairs without eliminating his power to dispose of his property *inter vivos*. It must also be emphasized that an elderly person, under voluntary conservatorship but with testamentary capacity, may use a will to make a testamentary disposition of his property by authority of the rule adopted in *Mayberry.* Finally, it should be pointed out that a

third party, who innocently contracts with a voluntary conservatee, may be protected from injustice on rescission by the court's application of the equitable principle of restoration of the status quo. See *Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 147, 515 P.2d 757 (1973).

For the reasons set forth above, we hold that the existence of the voluntary conservatorship deprived the voluntary conservatee, Helen M. Reller, of the capacity to contract and to convey away her property *inter vivos* in such a way that her estate would be diminished during her lifetime. On remand, if the court finds that the defendant, Larry D. Nolte, has given up valuable consideration which has benefited the estate of the conservatee, appropriate relief may be granted in the district court to restore the status quo by applying the basic principles of equity.

The judgment of the district court is reversed and remanded to the district court for further proceedings in accordance with the views expressed in this opinion.

FROMME, J., not participating.