468 So.2d 243 (1985)
CENTURY NATIONAL BANK OF BROWARD, As Personal Representative of the Estate of Camille Perry Bryan, Deceased, Appellant,
v.
Reed A. BRYAN, III, et al., Appellees.
James H. BRYAN, Sr., Stuart Bryan and Lucy Gardner Owens, Appellants.
v.
Reed A. BRYAN, III, Century National Bank of Broward, Etc., Lucy Gardner Sawyer, Anne Bryan Bell, Camille P. Bryan and Robert Anthony Owens, Appellees.
83-2098, 83-2133.
District Court of Appeal of Florida, Fourth District.
January 30, 1985.
Rehearing, Rehearing and Clarification Denied May 30, 1985.
Kenneth R. Mikos of Friedrich, Blackwell, Mikos, Ridley, P.A., Fort Lauderdale, for appellant  Century.
H.T. Maloney of Patterson & Maloney, Fort Lauderdale, for appellant heirs.
Reed A. Bryan, III, of Law Offices of McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, in pro. per.
Rehearing, Rehearing En Banc and Clarification Denied May 30, 1985.
DOWNEY, Judge.
The dispositive question in these consolidated appeals is whether a person who has become a voluntary ward, pursuant to section 744.341, Florida Statutes (1979), may during the pendency of the voluntary guardianship make inter vivos conveyances of the ward's real and personal property without court approval. The trial court held the ward has the capacity to make such conveyances and several of the heirs of the ward's estate and the personal representative thereof appeal. We reverse.
The Bryan family had been active for many years in the establishment and development of Broward County and the City of Fort Lauderdale. Camille Perry Bryan owned a home built in 1925 in the "historical district" of Fort Lauderdale where she and her husband lived until his death in *244 1969. Her nephew, Reed A. Bryan, Sr., and his son, appellee Reed A. Bryan, III, were extremely close to Camille and attended to her and her affairs through a good portion of her life. It appears that Camille wanted this home to remain in the Bryan family and to that end drew a will that, among other things, devised the home to her nephew Reed A. Bryan, Sr. However, he predeceased her in 1976. Thereafter, on numerous occasions Camille told various people she wanted appellee and his wife to have her home. She often conferred with them regarding furnishings, appliances, colors, and things of that nature for the home, because she assumed they would be living there eventually.
In 1977 Reed Bryan, III, prevailed upon Camille, who was then 98 years of age but mentally competent, to petition the court for appointment of a voluntary guardian to take over the management of her affairs. This was done and from April 1977 until the termination of the guardianship, shortly after Camille's death in 1981, the appellant, Century National Bank of Broward, acted as her voluntary guardian. While the voluntary guardianship was in existence in 1981, Reed Bryan, III, a lawyer, prepared and had Camille execute a warranty deed to the home in question. Simultaneously with the execution of the deed, appellee had Camille sign a petition for an order confirming the "sale" of the property to him. The petition alleged that it was Camille's desire to convey the title to said property and the personalty located therein to Reed Bryan, III, to keep the property in the family following her demise. It stated further that it was her desire to lessen the estate tax consequences to the ward's family and estate by transferring the subject property "as part of an estate planning procedure, as contemplated in § 744.441, Florida Statutes." The petition also stated that Reed Bryan III was to pay $100,000 as the purchase price therefor in the form of a promissory note; and to the extent the value of the property exceeded the note, the transaction was a gift. Bryan states in his brief that the purpose of seeking an order confirming the sale was to preclude any possible cloud on the title to the property due to the conveyance during the voluntary guardianship and to protect the guardian and appellee, Bryan.
During the pertinent time period, Bryan's law firm was general counsel for the appellant, Century National Bank; so one of Bryan's partners, William Meeks, forwarded the petition on to Lowell Mott, a senior vice-president handling the guardianship, for signature. Mott signed the petition and returned it to Meeks, requesting he be kept advised "as we progress in this transfer of real estate." The record indicates that the trust committee of the bank wanted the consent of the other potential heirs of Camille Bryan's estate to be obtained before the petition was filed. In any event, the petition was filed without all of such consents being obtained, but no order was ever entered thereon because Camille died before the proceedings were culminated.
The deed to the property in question, though executed in August 1980, was not recorded until March 1981. The guardianship was terminated in early November 1981, and this suit to quiet title was instituted by Reed Bryan, III, on November 25, 1981, naming as defendants the Bank, as personal representative of Camille's estate, and various relatives who had an interest in the estate. The Bank denied that Reed Bryan, III, had title to the property in question and sought to quiet title against him. Some of the heirs acquiesced in appellee Bryan's contentions, but others, who are appellants, denied Bryan's title based upon an assertion that appellee was guilty of inequitable conduct.
Appellee Reed Bryan, III, and the appellants filed motions for summary judgment based on their competing interpretations of section 744.341, Bryan contending that Camille had the power to convey the property without court approval, despite the voluntary guardianship, and the appellants contending that, by obtaining a voluntary guardianship, she surrendered the power to convey any of her property without such approval.
*245 The court, on April 21, 1983, entered an amended partial summary judgment finding that the deed was "not ineffective in the absence of a finding of incompetence on the part of the Ward," i.e., that the failure of the court in the guardianship to approve the petition for approval of the sale did not render the deed ineffective. After an evidentiary hearing, the court entered a final judgment finding that, by clear and convincing evidence, the presumption of undue influence had been overcome and that the deed to the real property also conveyed to Reed Bryan, III, the personal property present on the premises. The judgment further found that the appellant heirs offered insufficient evidence to support the affirmative defense of unclean hands and that the Bank failed to prove the grounds of its counterclaim to quiet title.
The procedure for establishing a voluntary guardianship was first enacted in 1975 and is codified as section 744.341, Florida Statutes (1979).[1] This procedure differs from the customary guardianship in that the ward is not mentally incompetent so as to be legally incapable of transacting his affairs. Rather, though he possesses legal capacity, he has been rendered actually incapable due to age or physical infirmity. Because he is not legally incompetent, some state laws involving voluntary guardianships or conservatorships allow the ward more freedom to transact some of his affairs. Thus, when examining case law from other states, one must closely scrutinize the peculiar statutes of those states.
As a result of our research on the subject, we believe the statutory scheme adopted in Florida renders a voluntary ward legally unable to convey his property, whether by gift or otherwise, without approval of the court. Section 744.341 provides that the voluntary guardian shall have the same duties and responsibilities as other guardians of property generally. Thus, the provisions of section 744.377 apply to a voluntary guardian, who, just as an involuntary guardian, is mandated to take possession of all the ward's property, which shall be assets in the guardian's hands for the payment of the ward's debts, taxes, and expenses, as approved by the court. On the petition of an interested person, or its own motion, the court may require the guardian to produce satisfactory evidence that the ward's assets are in his possession or under his control. Implementation of these statutory requirements would be nigh impossible if a voluntary ward could willy-nilly transfer his property as freely as though he were not involved under the protective supervision and control of the court as provided in the guardianship statutes generally.
We think it most appropriate that the Bank signed a petition along with Camille, in which it was alleged that Camille wanted appellee to have this property and that the transfer was being contemplated as an estate planning procedure. Section 744.441(17) provides expressly therefor. Upon presentation of such a petition, the court was in a position to determine the real intent of the ward and whether the proposed estate planning would likely be beneficial to the estate.
An excellent discussion of the subject emanated from the Supreme Court of Kansas in Citizens State Bank & Trust Co. of *246 Hiawatha v. Nolte, 226 Kan. 443, 601 P.2d 1110 (1979). While the following quote is lengthy, we think it reflects the flavor appropriate to this statutory scheme:
[W]e have concluded that a conservatee under a voluntary conservatorship cannot contract or deed away his property inter vivos without the prior approval of the conservator or, where required by statute, the approval of the district court. However,... he may make a testamentary disposition if the conservatee has testamentary capacity. In arriving at this conclusion, we are convinced that a contract rule would defeat the primary purpose of the voluntary conservatorship statute to dignify old age by eliminating, in many instances, the stigma of having the elderly person declared incapacitated or incompetent. Incapacity is a matter of degree. As all of us grow older, we gradually lose our faculties, both physical and mental. The longer we live and the older we become, the more we lose. If a voluntary conservatee, not mentally incapacitated, were to be given an unbridled power to contract or deed away his property inter vivos, the voluntary conservatorship would seldom be used, because the relatives of the elderly person, seeking to protect the loved one from his or her own actions, would of necessity, utilize the compulsory conservatorship procedure. Hence, the old folks would in most instances be required to spend their golden years branded as "incapacitated" or "incompetent."
It also appears to us that, if a voluntary conservatee were given the power in his discretion to dispose of his property inter vivos, it is doubtful that any person would want to accept the position of conservator, since such a conservator, although given responsibilities and duties, would really have no control over the estate of his conservatee. This would be an extremely difficult, if not impossible situation. We also note that such a holding would create a judicial exception, diminishing the broad powers of a conservator to control and manage the conservatorship assets provided for under the Kansas statutes. The Kansas legislature has not specifically granted a voluntary conservatee the power to contract or to incur debts while the conservatorship is in existence as is provided by the California statutes. If the legislature desires to make such an exception, it may do so.
601 P.2d at 1115.
In the recent case of Webster & Moorefield, P.A. v. City National Bank, 453 So.2d 441 (Fla. 3d DCA 1984), the court required a voluntary guardian to return a gift of $25,000 that the voluntary ward had given to the guardian during the pendency of a short-lived voluntary guardianship. Besides holding that the guardian was incapacitated to accept a gift of property from his ward, the court held that "the ward was without the capacity to convey her property to the guardian as a gift." 453 So.2d at 443. Like the appellee here, the guardian in Webster & Moorefield contended that the ward was competent to make a gift to the guardian without approval of the court. The Third District felt that argument defies the entire statutory scheme and we agree.
The inability to contract or make a gift of property inter vivos should not be confused with the capacity to make a testamentary disposition during the pendency of a voluntary guardianship. As the court pointed out in Nolte, citing its case of Union National Bank of Wichita v. Mayberry, 216 Kan. 757, 533 P.2d 1303 (1975):
In Mayberry, it is stated that a conservator has the duty to take charge of the conservatee's estate and manage and conserve it for the support of the conservatee. The conservator's duty, however, is to manage the estate during the conservatee's lifetime. It is not his function, nor that of the probate court supervising the conservatorship, to control disposition of the conservatee's property after death. The court concluded that the execution of a will by the conservatee did not interfere with the conservator's function. In Mayberry, the court clearly makes a distinction between testamentary *247 dispositions by a voluntary conservatee's estate during his lifetime.
601 P.2d at 1114.
See too Owen v. Wilson, 399 So.2d 498 (Fla. 5th DCA 1981), which held that section 732.606(1), Florida Statutes (1979), applies to guardians of incompetents and guardians of persons under voluntary guardianships alike.
It is not as though entering upon such a proceeding locks a ward into this state of incapacity forever. If the ward eventually determines that he no longer needs or wants the assistance and supervision of a voluntary guardian and the court, he can petition the court to terminate the proceeding. As the Third District said in Ahlman v. Wolf, 413 So.2d 787, 788 (Fla. 2d DCA 1982):
The entire basis of such a proceeding, as created by Sec. 744.341, is the capacity of the ward, who is therefore statutorily required to be "mentally competent," voluntarily to petition for its institution, to designate the guardian, and it necessarily follows, to secure the discontinuance of the guardianship at his request.
Furthermore, as an alternative to a voluntary guardianship, a person could simply execute a power of attorney and enable some trusted person to handle most of his affairs.
In view of the foregoing, we hold the deed from Camille Bryan to appellee, Reed Bryan, III, was ineffective to convey title to Bryan because the court that had jurisdiction over the guardianship never authorized or approved that conveyance.
Appellant's second point on appeal pertains to the trial court's ruling that the personal property contained in Camille's residence was transferred by implication in the deed purporting to convey the residence.
We believe the validity of such a transfer of personal property under the circumstances of this case is answered by our resolution of the validity of the transfer of the realty. There is no effective transfer thereof.
The final point involved is raised by the appellant heirs. They contend the trial court erred in finding that Reed Bryan, III, had successfully overcome the presumption of undue influence that arose from the legal relationship between Camille and appellee. We would concede that the heirs proved a number of things that seem irregular: the numerous hats worn by Reed Bryan, III, creating the appearance of conflicting interests; the failure to obtain waivers from the heirs before filing the petition for an order confirming the sale as required by the Bank; the questionable validity of the estate planning tool; and the retention of the deed for many months before recording it, to name but a few. However, in our scheme of things the trial court decides the facts. Once he has seen the witnesses and heard their testimony, with all the nuances thereunto appertaining, and resolved the conflicting claims, the matter is concluded if there is substantial competent evidence to support his conclusion. Thus, we have carefully considered this record to determine the adequacy of the proof to support the trial judge's conclusion on this question and find it sufficient. Although Camille was a woman of very advanced age there is no indication she was not mentally competent. On the contrary, the evidence is that she was mentally alert and competent. A number of witnesses testified that Camille wanted Reed Bryan III to have this property. She discussed it with various credible witnesses. Thus, taking the evidence in context and as a whole, we believe the trial judge was justified in concluding that the presumption of undue influence was overcome by clear and convincing evidence. Nevertheless, we reverse the order appealed from because Camille Bryan did not have the capacity to make the conveyance in question without court approval.
REVERSED.
HURLEY and WALDEN, JJ., concur.
NOTES
[1] 744.341 Voluntary guardianship. 

(1) Without adjudication of incompetency, the court shall appoint a guardian of the estate of a resident or nonresident person who, though mentally competent, is incapable of the care, custody, and management of his estate by reason of age or physical infirmity and who has voluntarily petitioned for the appointment. The petition shall be accompanied by a certificate of a licensed physician that he has examined the petitioner and that the petitioner is competent to understand the nature of the guardianship and his delegation of authority. Notice of hearing on any petition for appointment and for authority to act shall not be required, except that notice shall be given to the ward and any person to whom the ward requests that notice be given. Such request may be made in the petition for appointment of guardian or in a subsequent written request for notice signed by the ward.
(2) Any guardian appointed under this section shall have the same duties and responsibilities as are provided by law as to guardians of property generally.