No. 60,260

In the Matter of the Conservatorship of FRED A. MARCOTTE.

(756 P.2d 1091)

Opinion filed June 3, 1988.

*Scott E. Daniel*, of Daniel and Daniel, of Garden City, argued the cause was on the brief for appellant special administrator.

*Lelyn J. Braun*, of Garden City, argued the cause and was on the brief for appellees co-conservators.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by the special administrator from a judgment of the district court holding that a voluntary conservatee could make *inter vivos* gifts to his co-conservators and others without court approval. The Court of Appeals affirmed in part and reversed in part the judgment of the district court in an unpublished opinion. We granted the special administrator's petition for review.

In July 1980, Fred A. Marcotte filed a voluntary petition for conservatorship with the Finney County District Court. The petition stated that Marcotte was 77 years old and required the appointment of a conservator "because I am physically incapacitated and am unable to properly manage my property." The district court accepted the petition on July 18, 1980, and appointed a nephew and niece of Marcotte's, Charles L. Winter and Darlene M. Graff, as co-conservators.

Mr. Marcotte died testate on October 25, 1983. On December 23, 1983, Winter and Graff, who are also the co-executors of Marcotte's will, filed a petition for probate of the will. The bulk of Marcotte's estate passed in equal proportions to eight beneficiaries. On January 12, 1984, Winter and Graff filed a petition to terminate their conservatorship. The district court filed an order discharging Winter and Graff, and terminating the conservatorship, on January 13, 1984.

Winter and Graff filed an inventory and valuation of Marcotte's estate with the probate court on July 24, 1984. On December 7, 1984, five beneficiaries under Marcotte's will filed a petition to set aside the court's order discharging Winter and Graff as conservators. They alleged that Winter and Graff had failed to provide yearly accountings as required by K.S.A. 59-3029, that the beneficiaries had not received notice of the proceedings to terminate the conservatorship, and that the final inventory of the conservatorship failed to present an accurate, full, and final account of the property remaining in the conservatorship. On August 27, 1986, Gerald O. Schultz was appointed as special administrator to represent the estate of Fred A. Marcotte in the conservatorship proceedings.

The transactions challenged, first by the five beneficiaries and subsequently by special administrator Schultz, are a series of gifts made by the co-conservators, Winter and Graff, during the

course of the voluntary conservatorship. From 1980 to 1983, $146,000 in gifts were made. Of these gifts, $92,000 in mutual funds was given to either Winter or Graff, their spouses, or their children. The Graff family received $49,000 in gifts during this period, $24,500 of which was received by Darlene Graff. The Winter family received $43,000, $24,500 of which was received by Charles L. Winter. Neither the co-conservators nor their families had received gifts of mutual funds prior to the conservatorship's being established.

The co-conservators, Graff and Winter, testified that they never consulted with Fred Marcotte and never verified his intent in making the gifts. The gifts were initiated by Oliver Hester, a stockbroker and dealer in mutual funds. Hester would call them and inform them that Marcotte had made some gifts and would instruct them to write out a check in a certain amount. The conservators never made an attempt to independently verify Marcotte's wishes. The checks were then used to purchase the mutual funds, which Hester sold on a commission. Graff and Winter testified that they both later thanked Marcotte for his gifts, but never discussed with him the nature or the size of the gifts they had received.

On October 31, 1986, the district court ruled that the gifts made by Marcotte after May 27, 1983, were made while he was mentally incapacitated, and voided the gifts of approximately $24,000 in mutual funds made after that date. Finding Marcotte mentally competent prior to May 27, 1983, the court held that he could dispose of personal property by *inter vivos* conveyance during the conservatorship without court approval or control, and upheld the validity of the gifts of mutual funds made prior to May 27, 1983.

The Court of Appeals, in holding that a voluntary conservatee may not dispose of personal property by *inter vivos* conveyance without court approval, ruled that the gifts "must be returned to the estate." The Court of Appeals, however, held that the penalty provisions of K.S.A. 59-1704 did not apply in the present case. We granted the special administrator's petition for review.

The Court of Appeals correctly rejected the trial court's conclusion that a voluntary conservatee may dispose of personal property by *inter vivos* conveyance without court approval. The

trial court based its conclusion upon our decision in *Citizens State Bank & Trust Co. v. Nolte*, 226 Kan. 443, 601 P.2d 1110 (1979), where we said:

"[W]e have concluded that a conservatee under a voluntary conservatorship cannot contract or deed away his property *inter vivos* without the prior approval of the conservator or, where required by statute, the approval of the district court. However, as established by [*Union National Bank of Wichita v.*] *Mayberry* [, 216 Kan. 757, 533 P.2d 1303 (1975)], he may make a testamentary disposition if the conservatee has testamentary capacity. In arriving at this conclusion, we are convinced that a contrary rule would defeat the primary purpose of the voluntary conservatorship statute to dignify old age by eliminating, in many instances, the stigma of having the elderly person declared incapacitated or incompetent. . . .

"It also appears to us that, if a voluntary conservatee were given the power in his discretion to dispose of his property *inter vivos*, it is doubtful that any person would want to accept the position of conservator, since such a conservator, although given responsibilities and duties, would really have no control over the estate of his conservatee. This would be an extremely difficult, if not an impossible situation." 226 Kan. at 450-51.

The Court of Appeals concluded that the trial court's reading of our decision in *Nolte* was too narrow:

"We do not read *Nolte* as making any distinction between real and personal property. Rather, the *Nolte* court couched the issue in terms of the capacity of a voluntary conservatee to make an *inter vivos* disposition of conservatorship *assets*. 226 Kan. at 446.

"If the conservatorship statutes are to mean anything at all, the conservators must exercise control over the estate, and conserve the assets of the conservatorship under their charge of responsibility. To permit the conveyances here to stand totally undermines the control mandated by the statutes.

"[Marcotte] could have terminated his voluntary conservatorship and given gifts or made conveyances to anyone of his choosing. He could have changed his will during the conservatorship (assuming testamentary capacity); the voluntary conservatorship does not inhibit testamentary disposition of property.

"Under *Nolte* and the statutory mandates, [Marcotte] lacked capacity to make or direct the making of the *inter vivos* conveyances of personalty without court approval and control."

The conservators, Graff and Winter, have contended that a different result is compelled by *Union National Bank of Wichita v. Mayberry*, 216 Kan. 757, 533 P.2d 1303 (1975). In *Mayberry*, we held that a person subject to a voluntary conservatorship could change the designated payable-on-death beneficiary of savings bonds without the prior approval of the district court. However, *Mayberry* is not based upon any distinction between

real and personal property, but upon the distinction between testamentary and *inter vivos* dispositions of property. The changing of the payable-on-death beneficiary designation in *Mayberry* was permissible because the transaction was testamentary in nature and, therefore, did not contravene the conservator's obligation to manage the estate during the conservatee's lifetime. 216 Kan. at 761; *Nolte*, 226 Kan. at 449. The Court of Appeals properly concluded that a voluntary conservatee may not dispose of personal property by *inter vivos* conveyance during the conservatorship without court approval.

However, the Court of Appeals erred in concluding that the penalty provisions of K.S.A. 59-1704 were not applicable in the present case. K.S.A. 59-1704 provides:

"**Liability for conversion.** If any person embezzles or converts to his or her own use any of the personal property of a decedent or conservatee, such person shall be liable for double the value of the property so embezzled or converted."

Conversion is the unauthorized assumption or exercise of a right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987); *Carmichael v. Halstead Nursing Center, Ltd.,* 237 Kan. 495, 701 P.2d 934 (1985). The intent required for conversion is satisfied merely by the use or disposition of goods belonging to another. *Nelson v. Hy-Grade Construction & Materials, Inc.,* 215 Kan. 631, 527 P.2d 1059 (1974); *Farmers State Bank v. Haflich,* 10 Kan. App. 2d 333, 699 P.2d 553 (1985). Good faith is not a defense to a charge of conversion. *Farmers Grain Co. v. Atchison, T. & S.F. Rly. Co.,* 121 Kan. 10, 11, 245 Pac. 734 (1926). Clearly, the co-conservators converted $49,000 of the $96,000 in mutual funds to their own use. The Court of Appeals, in *In re Estate of Engels,* 10 Kan. App. 2d 103, 107-08, 692 P.2d 400 (1984), held that the penalty provisions of K.S.A. 59-1704 are mandatory, regardless of the conservator's putative good faith.

In the present case, the Court of Appeals concluded that the penalty provisions of K.S.A. 59-1704 should not be imposed because the conservators did not solicit the gifts nor were the gifts a result of undue influence, fraud, coercion, or duress.

In *Engels*, the Court of Appeals said:

"Ehlebracht's use of estate funds for his personal benefit was conversion, regardless of his professed belief that he could spend the money. See *Speer v. City of Dodge City*, 6 Kan. App. 2d 798, ¶ 1, 636 P.2d 178 (1981). Under the provisions of 59-1704, once a conversion by a fiduciary is found, the fiduciary 'shall be liable' for double the amount converted. The legislature's use of the word 'shall' indicates to us that the penalty is mandatory.

"In *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 507 P.2d 189 (1973), an innocent surety was held not liable for the penalty because 59-1704 was intended to punish wrongdoers. In construing 59-1704, the court declared that it is exemplary in character. 211 Kan. at 403.

" 'Exemplary or punitive damages go beyond actual or compensatory damages in that they are imposed, not because of any special merit in the plaintiff's case, but to punish the wrongdoer for his willful, malicious, oppressive or unlawful acts and to deter and restrain others from similar wrongdoings.' 211 Kan. 397, Syl. ¶ 4.

"Thus the purpose of the statute is to punish the fiduciary who converts funds and to warn others that the conduct is improper. The failure to impose the penalty neither punishes Ehlebracht nor deters other fiduciaries from similar misconduct. The trial court erred in not imposing the conversion penalty." 10 Kan. App. 2d at 108.

We agree. The conservators may have been innocent of undue influence, fraud, coercion, or duress, but conversion does not require any of these activities. Rather, as we previously noted, conversion arises from the unauthorized disposition of the personal property of another, regardless of the converter's good faith. We are urged by the special administrator to apply the conversion penalty to the total amount of $92,000.00 in mutual funds received by the Winter and Graff families. K.S.A. 59-1704 specifically applies to funds converted to one's own use and would therefore apply only to the $49,000.00 in gifts that went directly to the co-conservators. The gifts to other family members would not be subject to the conversion penalty. We conclude that the trial court and the Court of Appeals erred in failing to impose the conversion penalty on the gifts of mutual funds to the co-conservators.

The special administrator also makes three allegations of error of omission on the part of the Court of Appeals. He argues, first, that the Court of Appeals erred in failing to specifically order the co-conservators, Graff and Winter, to personally refund the invalidated gifts to the probate estate. The special administrator argues that, under the waste provisions of K.S.A. 59-1703, the

conservators (or their bonding company) should be personally liable for the invalidated gifts and, second, that the Court of Appeals erred in failing to require the payment of statutory interest upon each invalidated gift. Finally, he argues that other gifts and expenses incurred by the co-conservators/co-executors, Graff and Winter, in the amount of $2,603.47 should also be invalidated. The special administrator argues that, because the $2,603.47 in gifts and expenses were incurred after May 27, 1983, the date on which the trial court ruled Marcotte had become incompetent, the gifts and expenses should be invalidated.

We note that the district court, in ruling that a voluntary conservatee may dispose of personal property by *inter vivos* conveyance without court approval, failed to address the personal liability of Graff and Winter, the imposition of statutory interest, or the $2,603.47 in gifts and expenses incurred after May 27, 1983.

As a general rule, issues raised for the first time on appeal will not be reviewed. However, we have recognized three exceptions to that general rule:

"(1) Cases where the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; "(2) cases where consideration of a question raised for the first time on appeal is necessary to serve the ends of justice or to prevent denial of fundamental rights; and

"(3) cases where a judgment of a trial court may be upheld on appeal even though the court may have relied on the wrong ground or assigned a wrong reason for its decision." *Johnson v. Kansas Neurological Institute*, 240 Kan. 123, 126, 727 P.2d 912 (1986).

The gifts and expenses in question are listed in the annual accounting filed by the conservators. In addition, the co-conservator, Charles Winter, testified that he had made the payments and what they were for. The payments consisted of:

1. $457.00 to purchase a bed for Mr. Marcotte's sister, Lena;
2. $300.00 to St. Peter's Parish;
3. $75.00 for a hearing examination for Lena Marcotte;
4. $374.00 for the purchase of a hearing aid for Lena Marcotte;
5. $1,182.00 for airline tickets for co-conservators and their spouses to visit Uncle Oscar to help celebrate his 50th wedding anniversary; and
6. $214.00 for a rental car.

Clearly, these payments are "proved or admitted facts" and the extent of the co-conservators' liability for the payments is a question of law and, therefore, comes within the first exception recognized in *Johnson*.

The purpose of a conservatorship is to control, manage, and preserve the assets of the estate during the conservatee's life. The duties of a conservator are specifically set out by statute. K.S.A. 59-3019 provides, in part:

"A conservator shall be subject to the control and direction of the court at all times and in all things. Said conservator shall . . . (3) pay the reasonable charges for the support, maintenance, and education of the conservatee in a manner suitable to the conservatee's station in life and the value of the conservatee's estate; . . . (4) pay all just and lawful debts of the conservatee and the reasonable charges incurred for the support, maintenance, and education of the conservatee's spouse and children; (5) possess and manage the estate, collect all debts and claims in favor of the conservatee, or with the approval of the court compromise the same; . . . (7) invest all funds, except such as may be currently needed for the debts and charges aforesaid and the management of the estate . . . ."

### K.S.A. 59-1703 provides, in part:

"No fiduciary shall make a profit by the increase, nor suffer loss by the decrease or destruction without such fiduciary's fault, of any part of the estate . . . .

. . . .

"A fiduciary shall not be accountable for debts due the decedent or conservatee which remain uncollected without fault on such fiduciary's part, but where a fiduciary neglects or unreasonably delays to raise money by collecting debts or selling property, or neglects to pay over the money in his or her hands and by reason thereof the value of the estate is lessened, or unnecessary costs, interest, or penalties accrue, or the persons interested suffer loss, the same shall be deemed waste and the fiduciary shall be charged in his or her account with the damages sustained. . . .

"Any sale, lease or mortgage to the personal representative, his or her spouse, child or grandchild, agent or attorney in fact, or to any corporation in which he or she has a substantial beneficial interest, or any transaction which is affected by a substantial conflict of interest on the part of the personal representative, is voidable unless: (1) The will or a contract entered into by the decedent expressly authorized the transaction; or (2) the transaction is approved by the court after hearing upon notice to interested persons."

### Black's defines a fiduciary capacity as:

"One is said to act in a 'fiduciary capacity' or to receive money or contract a debt in a 'fiduciary capacity,' when the business which he transacts, or the money or

property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part." Black's Law Dictionary 753 (4th ed. rev. 1968).

Unquestionably, these payments were not made for the benefit of the conservatee nor do they represent necessary expenses of the conservatorship. In making these payments, the co-conservators violated the statutory duty imposed on them by K.S.A. 59-3019. As such, the payments constitute waste for which the conservator is liable to the estate for the $2,603.47, together with interest from the date of payment as provided by K.S.A. 16-201.

The special administrator argues that the district court and the Court of Appeals also erred in simply requiring the co-conservators to return the gifts to the estate or, in lieu thereof, to refund the original purchase price of the mutual funds. The special administrator correctly points out that this allows the conservators to benefit from their improper acts by keeping the profits they made over the years from the mutual funds. The co-conservators, by purchasing the gifts for themselves and others, failed to invest the funds as required by K.S.A. 59-3019(7), thus depriving the estate of the use of these funds. In addition, the co-conservators had a "substantial conflict of interest" as to these transactions and, pursuant to K.S.A. 59-1703, all such transactions are voidable unless approved by the court after notice to interested parties. The payments by the co-conservators to purchase the gifts were unauthorized and violated their duty and obligation to conserve and invest these very funds for the benefit of the estate.

The conservatorship statutes require that a conservator must exercise control over the estate and conserve the assets of the conservatorship. Here, the gifts resulted in personal gain to the co-conservators and their families, and diminished the estate. In *Rathbun v. Hill*, 187 Kan. 130, Syl. ¶ 6, 354 P.2d 338 (1960), the court said:

"The general rule that executors, administrators, guardians, trustees, and functionaries of that general character may not traffic to their own private advantage in estates or properties towards which they have any official or moral responsibility is as much a principle of ethics and practical honesty as it is of law."

The co-conservators are therefore liable for the resulting loss to

the estate. That loss is the amount paid by the co-conservators to purchase the gifts, together with interest on that amount from the date of payment as provided by K.S.A. 16-201.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the trial court is reversed and remanded with directions to enter judgment consistent with this opinion.