[L.A. No. 30326. In Bank. Apr. 18, 1975.]

BOARD OF REGENTS STATE UNIVERSITIES,
STATE OF WISCONSIN, Plaintiff and Appellant, v.
RALPH E. DAVIS, JR., as Executor, etc.,
Defendant and Respondent.

34

**COUNSEL**

Archbald, Zelezny & Spray and Kenneth L. Moes for Plaintiff and Appellant.

Robert R. Stone for Defendant and Respondent.

Beardsley, Hufstedler & Kemble, Jerome H. Craig, Irwin & Gluecksman, J. D. Gluecksman and Joseph L. Wyatt, Jr., as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**TOBRINER, J.**—Plaintiff Board of Regents State Universities, State of Wisconsin, appeals from a judgment on the pleadings in defendant's favor in an action to collect from the estate of a former conservatee, now deceased, a claim for $150,000. ██ The question presented is whether the imposition of a conservatorship without a finding of incompetency deprives the conservatee of the capacity to contract. We conclude that, subject to the limitations of Probate Code section 1858, it does not.

On August 25, 1967, defendant Ralph Davis, Jr., petitioned for appointment as conservator of the estate of Ralph Davis, Sr. The petition alleged that Davis, Sr., was over the age of 80 and unable properly to care for his property, a sizable estate with a net worth of $1.8 million. The court appointed defendant as a temporary conservator, and on October 25, 1967, named a committee of five, including defendant, as permanent conservators. The temporary conservatorship continued until the court issued letters of conservatorship for the five committee members on January 15, 1968. The petition did not allege, nor did the court find, that Davis, Sr., was either insane or incompetent.

Davis, Sr., was a graduate and former director of the Wisconsin Mining School, now the Wisconsin State University-Platteville. On January 6, 1968, he attended a stadium fund raising dinner in Platteville, Wisconsin at which time he signed a written agreement pledging $150,000 on a matching basis, for construction of a stadium for his alma mater.[1] Thereupon the university, unaware that Davis, Sr., was a conservatee, widely publicized the pledge in order to solicit matching contributions.

On September 10, 1968, the conservators filed in the probate court a petition for an order to show cause why the conservators should not be instructed to rescind the pledge, but, on September 21, 1968, before the petition could be heard, Davis, Sr., died. The court appointed defendant as executor of the estate. Representing the Wisconsin State University-

---

[1]"January 6, 1968

"I, Ralph E. Davis, desire to participate in the program for financing the projected stadium for Wisconsin State University-Platteville, I hereby agree to match funds raised from other sources up to a total of one-hundred and fifty thousand dollars, payable quarterly, as other funds have been collected.

"Ralph E. Davis
/s/ "RALPH E. DAVIS"

██

Platteville, plaintiff filed a claim in probate for $150,000, and upon defendant's rejection of the claim, commenced the present action.

Defendant filed a demurrer to plaintiff's complaint, contending in part that the mere existence of a conservatorship deprived the deceased conservatee of the capacity to enter into a pledge agreement. ██ The trial court overruled the demurrer; defendant then moved for judgment on the pleadings on the ground that the complaint failed to state a cause of action for the reasons set forth in the demurrer.[2] The trial court denied that motion. Defendant then renewed his motion for judgment on the pleadings, alleging that the Court of Appeal's decision in *Place* v. *Trent*[3] (1972) 27 Cal.App.3d 526 [103 Cal.Rptr. 841], filed August 29, 1972, after denial of the original motion, required the court to grant the motion. The trial court granted the renewed motion, entering judgment on the pleadings in favor of defendant.[4]

Prior to 1957, a petition for guardianship presented the only procedure available for a party to assume administration of the estate of an adult unable to manage his affairs (Prob. Code, div. 4). Except in the case of minors, a guardianship requires both allegation and proof of the insanity or incompetency of the proposed ward. (Prob. Code, § 1460.) ██ A ward under a guardianship lacks the capacity to enter into a contract (*Hellman Commercial T. & S. Bk.* v. *Alden* (1929) 206 Cal. 592, 608-609 [275 P. 794]).

Believing that the stigma of the label "incompetent" discouraged persons unable to conduct their affairs from seeking appointment of a guardian, the State Bar of California recommended, and the Legislature

[2]A defendant whose general demurrer has been overruled properly may renew the objection by way of a motion for judgment on the pleadings. (*Shabrick* v. *Moore* (1961) 195 Cal.App.2d 56, 58 [15 Cal.Rptr. 310]; 4 Witkin, Cal. Procedure (2d ed. 1971) pp. 2822-2823.)

[3]In *Place* v. *Trent, supra,* the court held void a conveyance of property from a conservatee to her nephew by deed of gift. The court rejected the argument that lack of a finding of incompetency on the part of the conservatee left her with full capacity to contract; the court reasoned that because guardianships and conservatorships were designed to serve the same purposes, the conservatee, like the ward, lacked capacity to contract even if the conservatee had not been adjudicated incompetent.

[4]The instant appeal is from a judgment on the pleadings. The motion for such a judgment performs the function of a general demurrer and is to be treated in the same fashion on appeal (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 411-412 [62 Cal.Rptr. 401, 432 P.2d 3]); it therefore "admits the material facts alleged in the pleadings of the adverse party" (*Hospital Council of Northern Cal.* v. *Superior Court* (1973) 30 Cal.App.3d 331, 338 [106 Cal.Rptr. 247]).

established, the new protective relationship of conservatorship. These efforts resulted in 1957 in the addition to the Probate Code of a fifth division, consisting of sections 1701 through 2207 (Stats. 1957, ch. 1902, § 1) establishing probate conservatorships.

■ The legislative history[5] indicates that both the State Bar and the Senate Judiciary Committee intended that the new relationship achieve two major objectives. The first was the establishment of the conservatorship as an alternative to guardianship to avoid, as we have noted, the "stigma" of the label "incompetency." In such a situation a conservator is merely another linguistic designation for a guardian.[6]

The second objective of the new statute was to extend its embrace to those who would otherwise find themselves without legal protection.[7]

---

[5]While the conservatorship bill was pending in the Legislature an analysis in the State Bar Journal commented: "This bill would add a new division to the Probate Code, creating and defining the office of conservator and the concept of conservatorship. Conservatorships would be an alternative to guardianships in some instances and would provide the benefits of a conservator in certain others wherein guardianships are not now permissible. Many elderly or ill persons are reluctant to ask that a guardian be appointed to conduct their affairs because of the label of 'incompetent' which attaches to them under the present law. The proposed legislation, by eliminating all reference to 'incompetency,' seeks to overcome this reluctance. Various changes from guardianship proceedings are also made in procedure. . . ." (Mull & Farley, *1957 Legislative Progress* (1957) 32 State Bar J. 13, 23.)

In its report to the Senate the Senate Judiciary Committee distinguished conservatorships from guardianships in the following language:

"The State Bar explained the purpose of the bill, as introduced, as follows:

"Conservatorship

"Senate Bill No. 1045 would add an entirely new division (Division 5) to the Probate Code, creating and defining the office of conservator and the concept of conservatorship. Conservatorships would be an alternative to guardianships in certain instances and would provide the benefits of a conservator in certain others wherein guardianships are not now permissible.

"(1) Purpose. . . there are in California today a great many people whose affairs should be given the protection of a guardianship but for whom such protection has not been sought. The proposed legislation, by calling the person requiring assistance a 'conservatee,' and the person appointed by the court to assist him a 'conservator,' and by eliminating all reference to 'incompetency' seeks to overcome the reluctance to use the protection which should be available under the law. . . ." (1 Sen. J. Appendix (1957 reg. sess.) p. 487.) The Senate committee's report then proceeded to outline some but not all of the many differences between the statutory scheme for guardians and that for conservators. (*Id.* at pp. 487-488.)

See also Lord, *Conservatorship* v. *Guardianship* (1957) 33 L.A. Bar Bull. 5.

[6]It is possible specifically to adjudicate a conservatee incompetent and hence without capacity to contract by providing in the order appointing a conservator that the conservatee is a person "for whom a guardian could be appointed" under the Probate Code. (Prob. Code, § 1751; Johnstone & Zilligitt, Cal. Conservatorships (Cont.Ed.Bar 1968) p. 3.)

[7]*Selected 1957 Code Legislation* (1957) 32 State Bar J. 501, 585.

The Legislature achieved this objective by providing that the court could appoint a conservator for a person who was neither insane nor incompetent, but who, for a variety of other reasons, needed direction in the management of his affairs.[8] Thus, clearly, the Legislature designed the conservatorship statute to cover a much more extensive category of eligible persons than the more limited guardianship law.

In view of the fact that the Legislature sought to accomplish by its conservatorship structure both the avoidance of the stigma of incompetency and the inclusion of a wider class, we must decide whether the Legislature intended that the conservatee who had not been adjudicated incompetent should nevertheless lose his capacity to enter into a contract. Although *Place* v. *Trent, supra,* 27 Cal.App.3d 526, held that in this respect the conservatee could not be distinguished from the ward in his inability to contract, we do not believe that the legislative history confirms this identity. As we shall show, this court has recognized a distinction between conservatee and ward; furthermore, we shall point out that section 1858 expressly upholds the conservatee's limited power

[8]Unless otherwise designated, all statutory citations hereafter are to the Probate Code.

Section 1460 identifies those persons for whom a guardian may be appointed. Section 1460 reads, in pertinent part, as follows: "Any superior court . . . may appoint a guardian for . . . an insane or an incompetent person, who is a resident of this State. As used in this division of this code, the phrase 'incompetent person,' 'incompetent,' or 'mentally incompetent,' shall be construed to mean or refer to any person, whether insane or not, who by reason of old age, disease, weakness of mind, or other cause, is unable, unassisted, properly to manage and take care of himself or his property, *and* by reason thereof is likely to be deceived or imposed upon by artful or designing persons." (Italics supplied.)

By contrast, the class of persons for whom a conservatorship may be established is much broader. Section 1751 identifies potential conservatees and reads in pertinent part: ". . . the superior court . . . shall appoint a conservator of the person and property or person or property of any adult person who by reason of advanced age, illness, injury, mental weakness, intemperance, addiction to drugs or other disability, or other cause is unable properly to care for himself or for his property, *or* who for said causes or for any other cause is likely to be deceived or imposed upon by artful or designing persons, or for whom a guardian could be appointed under Division 4 of this code, or who voluntarily requests the same and to the satisfaction of the court establishes good cause therefore . . . ." (Italics supplied.)

Thus, while a person who is insane or incompetent would readily fall within the definition of a conservatee in section 1751, many of the other classes of persons for whom a conservatorship might be established are not at all to be regarded as either insane or incompetent. In *Hillman* v. *Stults* (1968) 263 Cal.App.2d 848, 873 [70 Cal.Rptr. 295], the conservatee was mentally competent. There the court held that the imprisonment or parole of a felon "with a consequent limitation of civil rights is a cause or disability within the meaning of the conservatorship law of 1957." In *Conservatorship of Stewart* (1969) 276 Cal.App.2d 211 [80 Cal.Rptr. 738], the court appointed a conservator for a conservatee with his consent because he had suffered a heart attack and, by reason of anticipated surgery, contemplated that he would be unable to continue his business during his recuperation.

to contract and, finally, that the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) likewise recognizes such restricted power of the conservatee.

In our past treatment of the present problem 'we have linked the incapacity to contract under Civil Code section 40 with an adjudication of incompetency. Thus in *Hellman Commercial T. & S. Bk.* v. *Alden, supra,* 206 Cal. 592, we held that a ward's incapacity to contract stems from Civil Code section 40 which reads, as amended, in pertinent part, "Subject to Sections 1561 and 1910 of the Probate Code, and subject to Part I (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code after his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract, nor delegate any power or waive any right, until his restoration to capacity...."[9] As we explained, when "a court has regularly adjudged one to be incompetent, he thereby becomes incapable of making a valid contract, and it is deemed to be void, not because he is unable, unassisted, to properly care for his property, or lacked understanding of the nature and effect of the particular transaction, but because the decree of incompetency is notice to the world of his incapacity to make a valid contract." (206 Cal. at p. 604.)

*Hellman* has accordingly determined that an adjudication of *incompetency* presupposes a lack of capacity to understand the nature and effect of a contract. (206 Cal. at p. 605.) Noting that Code of Civil Procedure section 1764 authorizes a court to appoint a guardian for a person who is either insane or incompetent, the *Hellman* court concluded that such an appointment is an adequate adjudication of incompetency, and hence also of incapacity under Civil Code section 40. (206 Cal. at pp. 604-605.)

The argument that a conservatee lacks capacity to contract would necessarily, if it has any statutory source at all, stem from Civil Code section 40. Yet, inasmuch as *Hellman* holds that it is the finding of *incompetency* that serves notice of a person's incapacity under Civil Code section 40, conservatees who have *not* been adjudged incompetent should not be bound by that section's proscriptions.[10]

[9]Probate Code section 1561 provides that the wages of an employed adult ward subject to a guardianship shall not be subject to the guardianship estate. Section 1910 contains a similar provision with respect to the wages of an employed adult conservatee. Welfare and Institutions Code section 5000 et seq. is the Lanterman-Petris-Short Act, which provides for the involuntary detention of mentally disordered persons for evaluation and treatment.

[10]The 1963 amendment to Code of Civil Procedure section 372, providing that reference to an incompetent person includes the conservatee, rests upon the legislative

The fact that a conservatee has at least a limited power to contract is further evidenced by the 1963 amendment to section 1858[11] (Stats. 1963, ch. 1549, § 1, p. 3132), which provides in part that "The conservator shall pay debts incurred by the conservatee during the conservatorship for the necessaries of life. . . . The conservator shall pay any other debts incurred by the conservatee during the conservatorship only if they appear to be such as a reasonably prudent person might incur." This section quite clearly indicates that a conservatee retains power to contract, subject to the conservator's right to disaffirm unreasonable contracts other than those involving the purchase of necessaries which cannot be disaffirmed.[12] ▮ ▮▮▮ This section also provides that if the conservator entertains any doubt as to the propriety of the debt he may petition the court for instructions.[13] If all contracts of a conservatee, like those of a ward, were void, the protections of amended section 1858 would be totally unnecessary.

objective of procedural clarity and does not touch the conservatee's powers. Code of Civil Procedure section 372, relating to actions by persons under guardianship, was amended to provide that for the purposes of that section, "reference to 'incompetent person' shall be deemed to include 'a person for whom a conservator may be appointed.'" That amendment was a part of a package of code amendments sponsored by the State Bar to revise and reconcile Probate Code sections 1431 and 1510 dealing with the compromise or other collection of litigated claims on behalf of minors and incompetent persons. (See 37 State Bar J. 585, 597 (1962); 38 State Bar J. 485, 500 (1963); id. 780.) Since any money or property recovered by or on behalf of a conservatee should be collected and held by the conservator, it was convenient and proper to classify conservators with guardians in those code sections. This 1963 amendment dealt only with the procedural problem there involved and did not affect the status of the conservatee in any other aspect.

[11]Section 1858 reads in pertinent part as follows: "The conservator shall pay . . . any debts incurred by the conservatee before creation of the conservatorship; and he shall pay any debts incurred by the conservatee after the creation of the conservatorship, except that ability to continue to provide the conservatee with the necessaries of life, out of the estate, shall not be impaired. The conservator shall pay debts incurred by the conservatee during the conservatorship for the necessaries of life . . . and shall pay any other debts incurred by the conservatee during the conservatorship only if they appear to be such as a reasonably prudent person might incur. The conservator may petition the court for instructions when there is doubt whether a debt should be paid under the foregoing rules."

[12]Under sections 1561 and 1910 both a ward and a conservatee, if employed, retain complete control of his wages or salary unless the court directs otherwise. Hence to the extent of wages or salary, a ward or conservatee ordinarily may validly enter into contracts.

In the case of a conservatee, however, the Legislature evidenced an additional recognition of a conservatee's ability to contract when it provided in section 1861 that the court, upon petition of the conservator, may provide that the conservator pay the conservatee an allowance for the personal use of the conservatee, and the funds so paid to the conservatee shall be subject to his sole control.

[13]The conservator, of course, retains the power to void or rescind performance of contracts of the conservatee on the basis of any of the traditional defenses available to any other individual. (E.g., incapacity or fraud.)

■ Although defendant attacks this interpretation by urging that the term "debts" in section 1858 should be construed to include only liability for "non-consensual" debts such as tort and quasi-contractual obligations, we believe that such a construction of the statute is strained. Nothing supports the hypothesis that the Legislature intended so abnormal a restriction of a commonly used word.

The Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) also manifests the Legislature's recognition that conservatees retain a limited capacity to contract under probate conservatorships. Dealing with the mentally disordered person and chronic alcoholic, this act provides that such an individual may be placed under a conservatorship identical to those set forth in the Probate Code for conservatorships. (Welf. & Inst. Code, § 5350.) Implicitly recognizing a conservatee's right to contract, section 5357 provides that all conservators appointed under the act shall have all the general powers possessed by probate conservators and such additional powers, if any, that a court could grant under probate conservatorships. The section also provides: "The report [14] shall also recommend for or against the imposition of each of the following disabilities on the proposed conservatee: . . . (b) The right to enter into contracts. The officer may recommend against the person having the right to enter specified types of transactions or transactions in excess of specified money amounts."

If all conservatees were already presumed incapable of contracting, clearly this provision would be inappropriate. ■ The provision cannot properly be read to mean, as defendant suggests, that a conservatee only retains a right to contract under sections 1861 (allowances) and 1910 (wages), which the court under the Lanterman-Petris-Short Act can then limit and restrict. This interpretation cannot stand because the court, under sections 1861 and 1910, already retains the discretion to limit and restrict the conservatee's right to dispose of those funds, if any. (See fn. 12, *supra.*) Thus the only natural interpretation of Welfare and Institutions Code section 5357 is that the conservatee does, indeed, have some right to contract, which is defined pursuant to the Probate Code, and that under the Lanterman-Petris-Short Act this right may not be totally obliterated but only restricted by explicit judicial declaration.

---

[14]Before the court can authorize a conservatorship under this act, an officer must conduct a conservatorship investigation and issue a report pursuant thereto. (Welf. & Inst. Code, §§ 5352, 5356.)

Finally, we do not accept defendant's contentions that recognition of the conservatee's right to contract will frustrate the purposes of the Conservatorship Act and render unmanageable the administration of conservatorships. The fact that two persons co-manage property does not necessarily mean that the property thereby becomes unmanageable. Many types of relationships are premised upon co-management. (E.g., tenancy in common, joint tenancy, community property.) In some situations, in fact, the conservator will more likely play the role of supervisor rather than co-manager as in the case of a conservatee, not adjudged an incompetent, who has entered into reasonable contracts. The Legislature surely accepted the fact of co-management when it determined that a conservatee cannot totally be deprived of the right to contract.

Nor will our affirmation of the power of the conservatee to contract or convey property, subject to supervision and review by the probate court, defeat the primary purpose of the conservatorship, i.e., a means to enable a competent person legally to assist the conservatee in the management of his property. (*Conservatorship of Stewart* (1969) 276 Cal.App.2d 211, 214 [80 Cal.Rptr. 738].) Since the transfer of property and the incurrence of contracts undertaken by the conservatee remain subject to supervision and review by the probate court (§§ 1858, 1862), the conservatee retains the protection of the conservatorship.

In sum the scheme provides for a flexible and adequate protective relationship that enables the competent conservatee, who for some reason is unable properly to care for his property, to enter into a valid contract, upon the condition that it "appear to be such as a reasonably prudent person might incur."[15] If a proposed conservator harbors reservations about the proposed conservatee's competency he may simply ask the court to render a specific finding that the conservatee is a person "for whom a guardian could be appointed" in order that this conservatee, like a ward, be incapable of contracting. (§ 1751.) On the other hand, if a proposed conservatee is competent, no reason compels a total abolition of his right to contract. ▪ We therefore disapprove language in *Place* v. *Trent, supra,* to the effect that a conservatee is necessarily incapable of making a valid contract.

---

[15]Plaintiff has always been willing to demonstrate that Davis, Sr.'s, pledge of $150,000 was not so substantial as to place his estate of $1.8 million in jeopardy, and to prove that because of Davis, Sr.'s, long and friendly association with the university, the pledge was a reasonable one.

Conservatorship is a modern legal mechanism conceived to meet a realistic human desire to avoid the stigma of incompetency; the courts should permit its plenary use, unimpaired by the debilitating interpretation that strips the competent conservatee of the limited power to contract.

The judgment is reversed. The case is remanded to the superior court with instructions to set aside its order granting the motion for judgment on the pleadings.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.