[No. G035599. Fourth Dist., Div. Three. May 10, 2006.]

Conservatorship of the Person and Estate of EDWARD S. HUME, SR.
JOHN S. WILLIAMS, as Public Guardian, etc., Petitioner and Respondent,
v.
WILLIAM SNOW HUME, Objector and Appellant,

**COUNSEL**

William Snow Hume, in pro. per., for Objector and Appellant.

Benjamin P. de Mayo, County Counsel, and James C. Harvey, Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**SILLS, P. J.—**

## I.   BACKGROUND

William Snow Hume has appealed from the order of the trial court approving a final accounting by the county public guardian as conservator for Hume's now-deceased father.[1] His main complaint, and one which we must

---

[1] Since most of our discussion involves contentions made by son William Snow, and all references to his father or mother can be readily made clear by context or the generic term "conservatee," we are able in this opinion to refer to appellant by his last name, rather than resort to the convention, often used by courts in cases where several actors have the same last name, of referring to all the parties by their first names. Of course, no disrespect is meant when the latter convention is used (e.g., *In re Marriage of Jacobsen* (2004) 121 Cal.App.4th 1187, 1189, fn. 1 [18 Cal.Rptr.3d 162]), but it is nice when the nature of a family-intensive case is such that the first-name convention is not needed.

conclude is well-taken, is that the accounting failed to include his father's interests in certain real property in Tennessee.[2]

There is no question that the conservatee actually did own real property in Tennessee—the public guardian's accounting in fact listed the conservatee's one-half community interest in crop *rents* received from the property. Those rents didn't just fall off a pear tree. They were derived from a substantial asset owned by the conservatee.

Hume's own interest, as he voiced toward the end of the trial court hearing on the accounting, is that he is afraid that certain siblings are in possession of an "unrecorded trust instrument" on the property which—though he didn't quite come out and say it—might in some unspecified way be used to deprive him of his share in the property that he might otherwise receive by way of inheritance. Given that a conservator's accounting can be incorporated by reference in "traditional" (after-death) probate proceedings and the personal representative of the decedent has no duty to independently investigate the

---

[2] As we make clear *post* the question of whether a conservator is obliged to include out-of-state real property in an accounting is a legal one. Consequently, Hume's argument that the trial court was required to hold a contested evidentiary hearing on the issue simply because it was raised in formal objections filed by Hume to the accounting is not correct.

Hume has also abandoned the issue raised in his opening brief as regards the conservatorship established for his mother, Laura Snow Austin (i.e., whether a statement of decision was required). That leaves only one other issue properly raised in Hume's opening brief by way of separate heading or subheading, which is that the trial court lacked jurisdiction to rule on the inventory because of a prior pending proceeding—the mother's conservatorship. The problem with that argument is that Hume provides insufficient detail in his opening brief about the mother's conservatorship and accounting to even begin to entertain the notion that his mother's conservatorship somehow constituted a prior pending proceeding as regards his father's conservatorship. Since it is the duty of an appellant to provide a record showing error (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 [240 Cal.Rptr. 872, 743 P.2d 932]) and explain how that error occurred and how it is prejudicial (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337 [98 Cal.Rptr.2d 136]), we are forced to consider the prior pending proceeding argument as waived.

While Hume's brief also makes reference to a number of specific objections beyond the noninclusion of the Tennessee property to the accounting, the failure to explain specifically how the trial court's overruling of these objections was error and the further failure to identify them in a separate headings or subheadings also means these issues are waived on appeal. (See *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 [101 Cal.Rptr.2d 591] [refusing to address argument appearing under subheading inappropriate to that argument]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263] [rejecting contention made in petition for rehearing that due process claim had been properly raised because it was not mentioned in separate heading and "The failure to head an argument as required by California Rules of Court . . . constitutes a waiver."].)

transactions in the accounting,[3] we cannot a priori dismiss Hume's fears as insubstantial. In any event, the public guardian makes no argument that Hume is not a party aggrieved by the trial court's order.

While the record is sketchy, by way of background it is enough to say that sometime on or before June 2002, the Orange County Public Guardian was appointed conservator of Hume's father. Hume's father died in late 2003.[4] In October 2004 the public guardian filed his first and final accounting and report for the period June 2002 through September 2004, and a petition for its approval. The accounting did not list any Tennessee property as an asset of the estate (the assets of which were otherwise about $540,000), though it did list the conservatee's one-half community interest in crop *rents* "from Tennessee property." Hume filed objections to the petition. One thing he managed to make crystal clear was that the public guardian was under a legal obligation to list out-of-state real property and had failed to do so. (On appeal, the public guardian offers no argument that Hume's objection on this point was otherwise procedurally defective so as to relieve us of the need to address its merits.) The trial court took the matter under submission, and made an order in March 2005 overruling Hume's objections and approving the public guardian's petition. Hume has timely appealed from the formal order settling and approving the public guardian's first and final account filed May 6, 2005.

## II. DISCUSSION

### A. The Relevant Statutes

A conservator's accounting duties are set forth in sections 2610 and 2620 of the Probate Code.[5]

Section 2610, subdivision (a) provides: "Within 90 days after appointment, or within such further time as the court for reasonable cause upon ex parte

---

[3] The Rutter Group probate practice guide states: "When a personal representative receives assets from a deceased conservatee's conservator or deceased ward's guardian, the representative may incorporate by reference any accounting provided by the conservator or guardian for the decedent for the period subsequent to the date of death. Moreover, the personal representative is entitled to rely on the accounting and has *no duty to independently investigate or verify* the transactions reported therein." (Ross & Moore, Cal. Practice Guide: Probate (The Rutter Group 2005) ¶ 16:139.5, p. 16-41 (hereinafter The Rutter Group Probate), citing Prob. Code, § 10902.)

[4] The record is so sketchy that this fact is derived from taking judicial notice of a related unpublished opinion involving fees charged by an attorney appointed to represent the conservatee, *Conservatorship of Hume* (Oct. 31. 2005, G035035) [nonpub. opn.].

[5] All statutory references in this opinion are to the Probate Code unless otherwise specified.

petition of the guardian or conservator may allow, the guardian or conservator shall file with the clerk of the court an inventory and appraisal *of the estate*, made as of the date of the appointment of the guardian or conservator." (Italics added.)

Section 2610, subdivision (b) provides: "The guardian or conservator shall take and subscribe to an oath that the inventory contains a true statement *of all of the estate* of the ward or conservatee of which the guardian or conservator has possession or knowledge. The oath shall be endorsed upon or annexed to the inventory." (Italics added.)

Section 2620, subdivision (a) provides: "At the expiration of one year from the time of appointment and thereafter not less frequently than biennially, unless otherwise ordered by the court, the guardian or conservator shall present the accounting of the *assets of the estate* of the ward or conservatee to the court for settlement and allowance in the manner provided in Chapter 4 (commencing with Section 1060) of Part 1 of Division 3." (Italics added.)

Interestingly enough, the word "estate" is not specially defined in the general definitions sections of the Probate Code. (See §§ 21–88 [defining various terms of art in the probate code]; see also § 20 ["Unless the provision or context otherwise requires, the definitions in this part govern the construction of this code."].) Nor is the word specifically defined in the portions of the Probate Code dealing with conservatorships. The only words that appear specifically defined for conservatorship law (or guardianship law, since the two subjects are treated together) are "Conservator" and "Guardian" in section 2600. Conservator is defined in section 2600 with reference to the "estate" of a conservatee, but, again, estate itself is not defined, though it is clear that conservators are concerned with "the estate." (" 'Conservator' means (1) the conservator of the estate or (2) the limited conservator of the estate to the extent that the powers and duties of the limited conservator are specifically and expressly provided by the order appointing the limited conservator.")

The closest specific definition of the word "estate" as used in the conservatorship accounting statutes is the reference in section 2620 to the "manner" of accounting specified in section 1060 et seq. Section 1060 et seq. generally deals with contents of accounts.

Section 1061, subdivision (a)(1), requires all property to be accounted for, without exclusion for out-of-state real property: "All accounts shall state the period covered by the account and contain a summary showing all of the following, to the extent applicable: [¶] (1) The property on hand at the

beginning of the period covered by the account, which shall be the value of the property initially received by the fiduciary if this is the first account, and shall be the property on hand at the end of the prior account if this is a subsequent account." *Property* is defined in the Probate Code, in section 62, in way that includes out-of-state real property: " 'Property' means anything that may be the subject of ownership and includes both real and personal property and any interest therein."

Thus even without a specified definition for "estate" then, it would appear that the manner of accounting for conservatorships in section 2620 as further delineated in section 1061 et seq. contemplates inclusion of out-of-state real property.

When one looks at the ordinary meaning of the word "estate" as it must be construed under the statute, the inclusion of out-of-state property is confirmed. (Since "estate" is not given a particular definition in the statutes, courts should look to the common and ordinary meaning of the term. (See *Baxter Healthcare Corp. v. California Ins. Guarantee Assn.* (2000) 85 Cal.App.4th 306, 314 [102 Cal.Rptr.2d 87] ["That term is not defined or qualified by the act. It must be read in the context of the entire statute and given the meaning it bears in ordinary usage."].))

Granted, even for lawyers the word "estate" may carry the musty associations of first year property law, and for others the word is redolent of medieval hierarchies—think of Shakespeare's line about "when I came to man's estate" from Twelfth Night. In fact, in that regard, the very first set of definitions in the American Webster's Third New International Dictionary (1981 ed.) at page 778 gives the word "estate" a modern meaning equivalent to Shakespeare's, i.e., the word describes an overall condition or totality of circumstances. ("1: State, condition: a: the form of existence or state of being something . . . b: circumstances or situation in life . . . .") That itself is some indication that the Legislature intended the accounting of an estate to include everything, i.e., the *totality* of a conservatee's circumstances.

That conclusion becomes clearer when Webster's finally gets to the word in a context of property ownership. There, the focus is specifically on the *aggregate* or totality of one's property. The dictionary begins generally ("4. a: the property or a piece or aggregation of property in lands or tenements and sometimes personalty: fortune, possessions <a man of small estate>") and then gives the definition in which someone reading a probate code might be most interested: "b (1): the aggregate of property of all kinds that a person leaves for disposal at his death . . . *such an aggregate considered as a legal*

*entity* <the recoverable portion of the debt does not go to the decedent's estate but to his heirs> . . . ." (Webster's 3d New Internat. Dict. (1981) p. 778, italics added.)

The Oxford English dictionary follows the same pattern, beginning with definitions focusing on the idea of circumstance or condition, but when it gets to legal and accounting definitions, again provides a sense of aggregation: "11. Law. a. The interest which any one has in lands, tenements or any other effects . . . . 12. a. Property, possessions, fortune, capital. b. Accounts. The *collective assets and liabilities* of a person . . . ." (Oxford English Dict. (2d ed. 1989) pp. 407–408, italics added.)

Finally, Black's Law Dictionary is very to the point on aggregation. It begins by defining "estate" as: "1. The amount, degree, nature, and quality of a person's interest in land or other property. 2. *All that a person or entity owns*, including both real and personal property. 3. The property that one leaves after death; the collective assets and liabilities of a dead person. . . ." (Black's Law Dict. (7th ed. 1999) p. 567, italics added.)

■ In short, since the Probate Code does not define "estate" specially to exclude real property held outside a given jurisdiction, recourse to the ordinary meaning of the word indicates that the word "estate," as it is used in sections 2610 and 2620, imposes a duty on the conservator to account for all the conservatee's property, including out-of-state real property.

B.   Analogous Law

1.   Family Law and Bankruptcy

Our conclusion accords with two of the most common usages of the word "estate" in law—family law (as in "community estate") or bankruptcy (as in "bankruptcy estate"). The Family Code defines "community estate" as including "both community property and quasi-community property" (Fam. Code, § 63) and then goes on to define "community property" as "all property" acquired by a married person during the marriage domiciled in this state (Fam. Code, § 760) except as "otherwise provided by statute." There is nothing in the definition of separate property that differentiates in-state from out-of-state real property; both the definition of community property and the definition of separate property are concerned with "[a]ll property." (Cf. Fam. Code, §§ 760 & 770, subd. (a)(1)–(2).) Likewise, bankruptcy law defines the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case." (11 U.S.C. § 541(a)(1).)

## 2. Probate Law

Traditional probate law follows the same pattern, but with a slight twist. The personal representative of the estate of a dead person has, as one of his or her responsibilities, the marshalling of all assets and property interests of the dead person. Section 9650, subdivision (a)(1) provides: "The personal representative has the right to, and shall take possession or control of, *all the property* of the decedent to be administered in the decedent's estate and shall collect all debts due to the decedent or the estate." (Italics added.)

Now, it is true that out-of-state real property is traditionally handled through ancillary probate administrations in the foreign jurisdiction, the theory being that those jurisdictions subject local assets to their own probate administration to protect local creditors. (See generally The Rutter Group Probate, *supra*, ¶ 14:291, p. 14-63 ["But often a decedent leaves property in other states (or countries) as well. Those other states have jurisdiction to subject local assets to their own probate administration in order to protect local creditors . . . ."].) Concomitantly, the Rutter practice guide concludes that out-of-state property should not be listed on the inventory of real property specifically required under section 13103,[6] but that is of only tangential significance in this case, since section 13103, *by its terms*, is *only* concerned with real property inside California.[7]

More to the point, the fact that there may be no need to list out-of-state real property in a traditional probate inventory because it is subject to an ancillary administration[8] does not mean that it is not an asset of the estate available for eventual distribution by the personal representative administering the primary probate. (See The Rutter Group Probate, *supra*, ¶ 14:293, p. 14-64 ["An ancillary administrator generally collects those assets of decedent within the state, pays local creditors and then, under court order, typically transfers the remaining property to the out-of-state representative administering the primary probate."].)

---

[6] "Real property located in another state should *not* be listed on the inventory. It is handled through ancillary administration." (The Rutter Group Probate, *supra*, ¶ 6:98, p. 6-648.)

[7] Here is the entire text of the statute: "If the estate of the decedent includes *any real property in this state*, the affidavit or declaration shall be accompanied by an inventory and appraisal of the real property. The inventory and appraisal of the real property shall be made as provided in Part 3 (commencing with Section 8800) of Division 7. The appraisal shall be made by a probate referee selected by the affiant or declarant from those probate referees appointed by the Controller under Section 400 to appraise property in the county where the real property is located." (Italics added.)

[8] In fact, The Rutter Group Probate guide advises practitioners to avoid ancillary administrations if possible. (See The Rutter Group Probate, *supra*, ¶ 14:294. p. 14-64 [since ancillary administrations "*raise the cost* to all concerned . . . the first consideration should always be whether an ancillary probate is *avoidable*"].)

The cases of *In re Ortiz* (1890) 86 Cal. 306 [24 P. 1034] and *Estate of Massaglia* (1974) 38 Cal.App.3d 767 [113 Cal.Rptr. 751] are both particularly instructive for us in this regard, because both are clear that California estate executors or personal representatives have duties to marshal out-of-state property for the benefit of the probate estate.

*Ortiz* arose when a San Francisco resident died, leaving a large amount of money in San Francisco, but also leaving one-half of a house and lot and some personal property in Spain, plus some otherwise undescribed property in Mexico. He left a will executed in Spain, appointing his son-in-law, who was a Spanish citizen, as executor. He took possession of the "assets of the estate which were then in Spain, and converted all the personal property into money" and then removed to California with the purpose of administering the California assets. (*In re Ortiz, supra*, 86 Cal. at pp. 309–310.) He filed an inventory of all the property of the estate, including that "situate in Spain" but failed to charge himself with the assets in Spain, and prayed that the residue of the estate be distributed. Two beneficiaries of the will who resided in California filed objections on the ground that the Spanish executor had "failed to charge himself with the assets of which he, in his character of ancillary administrator, took possession in Spain." (*Id.* at p. 311.) The net result of the hearing was that the trial court charged the executor about $10,000 which it found to be "the residuum of the Spanish assets after deducting all proper demands and charges against the estate in Spain." (*Ibid.*)

As against an appeal on the theory that the administration of the Spanish assets was still open (see *In re Ortiz, supra*, 86 Cal. at p. 311), our Supreme Court affirmed. Noting, among other things, that there was substantial evidence that the administrator had deliberately not closed the Spanish administration ("intending not to account for or to distribute [the Spanish] residuum in this state, but to account for and distribute it, if at all, in Spain," (*id.* at p. 312)), our high court quoted a long passage from a late-19th century treatise on estate administration, the principal point of which is that administrators can't just ignore out-of-state assets, but have a duty to collect them for the benefit of the beneficiaries of the estate (at least the net residue). (*Id.* at p. 313.) Here is the key passage: "If, therefore, assets cannot be collected and realized for the benefit of the estate without a foreign ancillary appointment, the executor or administrator of the decedent's last domicile ought, so far as may be consistent with his information, the means of the estate at his disposal, and the exercise of a sound discretion, to see that foreign letters are taken out, *and that those assets are collected and realized, and the surplus transmitted to him.*" (*Id.* at p. 314, quoting Schouler, Executors and Administrators (2d ed. 1889) § 175, italics added.)

Much the same thought is found in *Massaglia*, that is, in-state administrators of estates can't just ignore foreign real property. They must exercise reasonable diligence to collect and to realize it for the benefit of the estate. In *Massaglia*, the decedent left a two-thirds interest in a hotel in New Mexico, plus he owned a garage abutting the hotel outright. The administrator of the estate was a California bank, which brought in a New Mexico bank to commence ancillary proceedings there. (*Estate of Massaglia, supra*, 38 Cal.App.3d at pp. 771–772.) As it turned out, though, the hotel had been allowed to go into foreclosure and the California bank advanced money, about $36,000, from the California estate, but only $2,500 of that sum was authorized by a California court. The trial court said that the California bank had no duty with respect to the New Mexico assets "other than to see that the ancillary administrator was appointed" and went so far as to conclude that "it was the primary duty of the special ancillary administrator," not the California bank, to "redeem the estate's interest" in the hotel. Thus the trial court surcharged the California bank the difference between the sums $36,000 advanced and the $2,500 approved, though it also, consistent with its idea that the California bank was not responsible for the hotel, rejected a request to surcharge the California bank for damages alleged from a failure to redeem the hotel in foreclosure proceedings. (*Id.* at pp. 772–773.)

On appeal, the California bank took issue with the trial court's notion that it had no responsibility to preserve the estate's equity in the New Mexico property (other than to see that an ancillary administrator was appointed), and the appellate court agreed. (*Estate of Massaglia, supra*, 38 Cal.App.3d at p. 773 ["Security asserts that, contrary to the finding of the trial court that it had no duty with respect to the New Mexico property except to see to the appointment of a special ancillary administrator there, it had a responsibility to preserve the estate's equity in the New Mexico assets. We agree."].)

It supported its conclusion in this passage: "It is true, as all parties all recognize, that one of the purposes of an ancillary probate proceeding is to collect and conserve assets in other jurisdictions for the benefit of creditors *there* . . . . It is also true that costs of administration of the ancillary estate should ordinarily be borne out of the assets of that estate . . . . But these considerations cannot in any way detract from the duty of a domiciliary executor or administrator such as [the California bank] to look to the next step involved in an ancillary probate administration after the ancillary creditors have been paid: the gathering in to the domiciliary estate of the excess assets properly belonging to it . . . . *There is a duty on a domiciliary executor or administrator also with respect to real property located in a foreign jurisdiction.* As in the present case, both real and personal assets were located in another jurisdiction in *In re Ortiz* . . . . [¶] . . . As was said in *Ortiz* . . . 'And yet, *to let external assets knowingly escape his control*, and be lost to the estate, when with reasonable diligence they might have been procured,

seems a plain dereliction of duty in the principal or domiciliary representative, whose function, as rightly understood, *is to grasp the whole fortune*, as the decedent did during his life, save so far as the obstructive law of foreign situs, or the limitations of his own appointment, may restrain him.' " (*Estate of Massaglia, supra*, 38 Cal.App.3d at pp. 773–774, italics added, some original italics deleted.)

The net result was that the case had to be remanded, because it was clear that the trial court had erred in concluding that the California bank "had no duty at all in connection with the New Mexico property" and the trial court would need to determine whether to ratify the bank's expenditures (in excess of $2,500) made with regard to that property. (*Estate of Massaglia, supra*, 38 Cal.App.3d at p. 775.)

Thus, to the degree that an executor in probate can be analogized to a conservator, the duties of the executor not to let foreign real property escape from his or her control (*Massaglia*), and to account for foreign real property assets lest it be charged (*Ortiz*), would suggest that a conservator has a similar duty to account for out-of-state real property. Moreover, the differences between a conservator and an executor, if anything, would suggest that the conservator should have greater duties in terms of accounting for the whole estate of the conservatee. A conservator is concerned with the well-being of a living human being who would ordinarily have continuing control over all his or her assets and would use them to maintain his or her standard of living, regardless of where they were located. An executor is ultimately concerned with liquidating or otherwise disposing of a body of property and liabilities according to a certain set of prescribed rules.

## C. Common Sense in Light of the Purposes of Conservatorship

Indeed, picking up on theme of the reasons a conservatorship might be established in the first place, it would appear that no good reason exists not to account for all of a conservatee's property, including out-of-state real property. The purpose of a conservatorship is to enable a competent person to "assist the conservatee in the management of his property." (*Board of Regents v. Davis* (1975) 14 Cal.3d 33, 43 [120 Cal.Rptr. 407, 533 P.2d 1047].) To do a proper job of looking out for the conservatee's well-being, for example, it is fundamental that a conservator would not want, as the *Massaglia* court put it, "to let external assets knowingly escape his control" (*Estate of Massaglia, supra*, 38 Cal.App.3d at p. 774)—again, that is more important for a live person than a dead one. One can only assume that a conservator who had the best interests of a conservatee at heart would want to know the maximum amount of resources available for the benefit of the conservatee.

Suppose, for example, that a conservatorship were established in California for a California resident whose main asset was a potato farm in Idaho, and it was this farm which provided the bulk of the conservatee's income at the time of the conservatorship. No one would argue that the conservator would be justified in taking no action to preserve the farm from foreclosure (let us assume, as in *Massaglia*, that there was a California bank account from which Idaho lawyers could be paid) and letting the farm and its income be lost. It is true of course that, under certain circumstances (say, the income was insufficient to support the conservatee in her normal lifestyle and prudence dictated that the asset be liquidated), the conservator might have to initiate "ancillary" proceedings in Idaho—in fact that might be required if (as in *Massaglia*) out-of-state foreclosure proceedings had commenced. Even so, it would be unconscionable for the conservator to allow the conservatee's standard of living to languish on the theory that the out-of-state property was outside of the conservatee's estate merely because it was out of state.

## D. The Case Against Inclusion

To recap: The plain language of the relevant conservatorship statutes, analogous law in family law, bankruptcy and probate, and simple common sense in light of the purpose of a conservatorship all point in the direction of including foreign real property within the duties to account for "the estate" or "for all of the estate" in sections 2610 and 2620. So why did this trial court rule that the public guardian had no legal duty to include the conservatee's Tennessee property in his final accounting?

The public guardian relies on two pieces of authority: section 755 of the Civil Code and a Continuing Education of the Bar (CEB) book, *California Conservatorship Practice* (CEB 2005). Neither are persuasive of the public guardian's position.

Civil Code section 755 consists of one sentence: "Real property within this State is governed by the law of this State, except where the title is in the United States." The statute thus simply establishes in rem ("against a thing") jurisdiction over real property in California, except property owned by the federal government. But it hardly follows from the idea that California courts have jurisdiction to adjudicate matters concerning real property in California that they *don't* have jurisdiction over in-state *conservators* (against the person as distinct from against the thing) to order them to account for property within the "estate" under their control, and in fact both the *Ortiz* and *Massaglia* cases directly refute any such idea. There is a distinction between in rem jurisdiction over property and in personam jurisdiction over in-state parties; family law, for example, long ago solved the problem of foreign real

property within community estates by recognizing the jurisdiction of a court to *order parties to take action*, as distinct from adjudicating rights directly. Thus family courts regularly use their jurisdiction over in-state divorcing spouses to order them to take whatever action is necessary to transfer *interests in* real property located out of state, and there is no jurisdictional obstacle to having divorcing spouses account for such property. (See Fam. Code, § 2660, subd. (b) [if not possible to divide out-of-state community real property in such a way as not to affect the "nature of the interests held" in such property, authorizing court to require parties to "execute conveyances or take other actions with respect to the real property situated in the other state as are necessary"]; e.g., *In re Marriage of Economou* (1990) 224 Cal.App.3d 1466, 1479–1483 [274 Cal.Rptr. 473] [affirming amended judgment awarding wife half-interest in Georgia property]; see also *Muckle v. Superior Court* (2002) 102 Cal.App.4th 218, 226 [125 Cal.Rptr.2d 303] [" ' "a court having jurisdiction of the parties . . . may adjudicate their rights to land located in another state" ' "].)

It would stand California community property on its head, for example, if the mere act of taking title to land outside of California could insulate what would otherwise be community property from California's equal division laws, or obviate what would otherwise be one spouse's duties toward the other. (See Fam. Code, §§ 1100–1103.)[9] To put it simply, you can't hide community earnings from division by the family court by the expedient of investing them in Arizona real estate.

The other authority on which the public guardian relies is the CEB conservatorship book, and specifically section 10.71 (on p. 477). This is the first paragraph in its entirely: "Real property outside the state is not subject to the jurisdiction of California Courts (see CC § 755) and is therefore not included in the inventory, although income received from, and expenses paid on, the property are included in the conservator's accounts. The conservator may wish to take some action outside the state to protect the conservatee's interests, e.g., initiating a proceeding in that state." (1 Cal. Conservatorship

---

[9] Family Code section 1103 actually centers on permutations of cases where one or both spouses has a conservator. The statute (all three subdivisions) refers the reader to section 3000 et seq. of the Probate Code. Section 3000 begins the part of the Probate Code involving management of community property where one of two spouses lacks legal capacity. Generally, the spouse with legal capacity (as distinct from the spouse who is a conservatee) will have exclusive management and control of the community property, including its disposal (*id.*, § 3051, subd. (b)(1)), and thus section 3054 allows for exclusion of designated community assets from the conservatorship estate. That makes perfect sense when there is a capable spouse who can undertake control of the excluded assets. Beyond that, we do not need to discuss this set of statutes. The public guardian has made no argument based upon them.

Practice, *supra*, § 10.71, p. 477.) (We need not quote the second one-paragraph remainder of the section, which merely talks about a distinction between mineral interests (real property) and royalties (personal property), without itself referencing any source material or elaborating on the jurisdictional point.)

Again, it does not follow that because a California court may not have in rem jurisdiction over out-of-state real property that it has no jurisdiction over an in-state conservator to impose on that conservator the duty of accounting for out-of-state real property. As we have seen, a California family court faces no jurisdictional obstacle preventing it from ordering parties over whom it exercises in personam jurisdiction to execute conveyances or take all necessary action to implement a California property division decree. (Fam. Code, § 2660, subd. (b).) There is thus nothing inherent in Civil Code section 755, or, more broadly, in the fact that California courts do not have in rem jurisdiction over out-of-state property, that mandates the exclusion of such property from conservatorship accountings.

Finally, at oral argument, counsel for the erstwhile conservator was unable to proffer a theory that made overall sense of the law. When asked about the rents from the Tennessee property of which the public guardian *did* acknowledge receipt, counsel could say no more than the public guardian was happy to take money practically thrown at it, but did not otherwise have any duties toward the property. That makes no sense—either the conservatee was entitled to receive the money because it was part of his, er . . . estate. Or he wasn't.

Or what about if the conservatee had needed to have the Tennessee property liquidated? Counsel suggested that Hume might have gone to Tennessee himself to open an "ancilliary conservatorship." But that makes no sense either. Since there already was a conservatorship in California, Hume would have no *standing* to open up such an ancilliary conservatorship. We may take it as elementary due process that a Tennessee judge isn't just going to let any relative of a person for whom a California conservatorship has already been established to open up proceedings to sell that conservatee's Tennessee real property. That judge is going to require the already-appointed conservator to authorize any sale.

### III.  CONCLUSION

In overruling Hume's objection focused on the absence of out-of-state property in the conservator's accounting, the trial court was under the misimpression that there was no legal requirement to include such property. The order approving the accounting is therefore reversed, and the case remanded for further proceedings not inconsistent with this opinion. Appellant shall recover his costs on appeal.

Bedsworth, J., and Fybel, J., concurred.