Filed 8/4/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of FRANK PARKER. | B245202 |
| | (Los Angeles County Super. Ct. No. BP094578) |
| MARK BOOTHBY, | |
|     Petitioner and Respondent, | |
|     v. | |
| RICHARD NORENE et al., as Coconservators, etc., | |
|     Objectors and Appellants. | |

    APPEAL from a judgment of the Superior Court of Los Angeles County. Michael Levanas, Judge. Affirmed.

    Weinstock Manion, Blake A. Rummel; Law Office of Cynthia R. Pollock, Cynthia R. Pollock for Objectors and Appellants.

    Law Offices of L'tanya M. Butler, L'tanya M. Butler; Law Offices of Howard A. Kapp, Howard A. Kapp for Petitioner and Respondent.

_____

A conservatee's debts—incurred before creation of the conservatorship—must be paid from his estate. (Prob. Code, § 2430, subd. (a)(1).)[1] Here, a creditor seeks to collect an exemplary damages award from a tortfeasor who was placed under a conservatorship after he was sued for his wrongdoing. We conclude that the debt was incurred when the conservatee committed the tort, not when the jury rendered its verdict awarding damages for the wrongful conduct. As a result, the conservator must pay the punitive damages award to the creditor from the conservatee's estate.

## FACTS[2]

Mark Boothby and Frank Parker met in 1990. They decided to start "flipping" homes: Parker would contribute funds to purchase and remodel homes and Boothby would contribute "sweat equity" by doing the necessary work. They agreed to split sale profits equally after reimbursing Parker for his outlays.

In 2002, Boothby found undeveloped land in Lancaster (the Property), which the two men purchased for $495,000. During escrow, they received an offer for the Property that would yield them each a profit of $250,000. They declined the offer and formed a corporation called Fresh Start Developments (Fresh Start) to take title. They planned to build condominiums. Before escrow closed, Parker informed Boothby that he wanted title to be in his name alone. Boothby quitclaimed his right to ownership of the Property.

The men agreed that Parker would fund preparations for developing the Property and Boothby would facilitate the process. They reaffirmed their agreement to share profits equally after reimbursing Parker. Boothby relocated to Lancaster to oversee the project, meeting with architects and engineers and learning the requirements for

---

[1]    Unlabeled section references in this opinion are to the Probate Code.

[2]    The facts are taken from this Court's opinion in *Boothby v. Parker* (Mar. 5, 2010, B200679 (nonpub. opn.). We take judicial notice of the prior appeal as a related proceeding leading to the present appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 401.)

developing land. Parker paid Boothby's expenses, including rent, telephone, a truck, and a $2,000 weekly advance.

The partners considered selling the Property in 2003, when Parker was ill, and Boothby found a local developer who offered to purchase it for $3 million. Parker and Boothby decided not to sell the Property. Instead, they contemplated joining forces with the developer in a deal in which Fresh Start would receive 75 percent of the profit from the sale of the condominiums and the developer would receive 25 percent.

To document this proposal, Boothby contacted Attorney Olga Karasik, who met with Boothby and Parker in January 2004. She understood that they were partners who agreed to share profits from the development project. She advised them about the risks of individual ownership, and suggested holding title through a California limited liability company. Boothby signed a retainer agreement identifying himself, Parker and Fresh Start as Karasik's clients. Karasik next met with Boothby, Parker and the developer from Lancaster to discuss the proposed development agreement.

In February 2004, Parker's friends and family convinced Parker to sever his relationship with Boothby. They believed that Boothby was taking advantage of Parker. Parker angrily demanded the keys to the truck he had acquired for Boothby's use, and would not answer Boothby's questions or confirm their partnership. He ceased paying rent on Boothby's apartment. They stopped communicating.

Karasik redrafted the development agreement to exclude Fresh Start, listing only Parker and the Lancaster developer as the contracting parties. She created a joint venture in which Parker received 75 percent of the profits and the developer received 25 percent. In March 2004, Krasik terminated her representation of Boothby, claiming a conflict of interest between Parker and Boothby. Afterward, Boothby learned of the joint venture agreement between Parker and the developer.

On February 8, 2005, Boothby sued Parker for breach of contract, breach of fiduciary duty, fraud, defamation, and emotional distress. Boothby asserted claims against Karasik and her law firm for malpractice and breach of fiduciary duty. Parker

cross-complained for elder abuse, fraud and misrepresentation, alleging that he suffered from diminished mental capacity due to dementia, alcoholism and diabetes.

By special verdict, a jury found that Parker breached his fiduciary duty to Boothby, and acted with malice, fraud, oppression, or despicable conduct. The jury found against Karasik and her law firm for malpractice and breach of fiduciary duty. In a judgment entered May 4, 2007, Boothby was awarded $725,000 in economic damages against Parker and the law firm defendants, jointly and severally, and $350,000 in punitive damages against Parker and the Parker Family Trust.

The defendants appealed. This Court affirmed the punitive damages award, but reduced economic damages from $725,000 to $325,000. Subsequently, the law firm defendants tendered compensatory damages of $325,000 to Boothby, leaving unpaid the punitive damages award of $350,000.

While Boothby's lawsuit was pending, and before judgment was entered, a temporary conservatorship was established for Parker in October 2005; this became permanent in February 2006. Boothby petitioned the probate court to direct Parker's conservator to pay the judgment. Parker resisted the petition.

The probate court ruled that (1) Parker's debt to Boothby pre-dates the conservatorship "because the debt was incurred at the time the tort occurred" and (2) all debts and expenses incurred before the conservatorship "must be paid by the Conservator regardless of whether that payment would impair the ability to provide the necessaries of life to the Conservatee." The court ordered the conservator to pay Boothby $350,000 in punitive damages and $137,958 in interest on the award.

## DISCUSSION

Conservatorships are governed by the Probate Code. (§ 1800 et seq.) Boothby petitioned the probate court to order the conservator to pay a debt due from Parker, the conservatee. (§ 2404, subd. (a).) Appeal may be taken from the order directing the conservator to pay a debt or claim. (§ 1300, subd. (d).) The appeal presents a question of law regarding the interpretation and application of the Probate Code to undisputed facts.

4

Boothby sought payment of the judgment pursuant to section 2430, which states that a conservator "shall pay" from the principal and income of the estate "debts incurred by the [ ] conservatee *before creation* of the [ ] conservatorship." (§ 2430, subd. (a)(1), italics added.) By contrast, payment of debts incurred by the conservatee *during* the conservatorship "are not required to be made to the extent the payments would impair the ability to provide the necessaries of life to the conservatee." (§ 2430, subds. (a)(3), (b).)

Parker's conservators acknowledge the mandatory statutory language applying to debts incurred before creation of the conservatorship, versus the "necessaries of life" discretion afforded to debts incurred during the conservatorship. They posit that the debt in this case was incurred "during the conservatorship"—and is therefore discretionary—because the judgment Boothby obtained against Parker was entered after the conservatorship was established. In the conservators' view, because Boothby became a judgment creditor after the jury rendered its verdict, "the 'debt' Boothby seeks to satisfy clearly post-dates the Conservatorship."

The law does not support the conservators' view. Debts arising from wrongful conduct are incurred when the tort is committed, not when judgment is entered.

"It is well settled in this state that the relationship of debtor and creditor arises in tort cases the moment the cause of action accrues." (*Hansen v. Cramer* (1952) 39 Cal.2d 321, 323.) "[T]he term 'debt,' used in our statutes, 'should be given its modern legal significance, as including any sort of obligation to pay money.'" (*Chalmers v. Sheehy* (1901) 132 Cal. 459, 465.) A debtor is someone who "is or may become liable to pay money to another, whether such liability is certain or contingent." (Civ. Code, § 3429.) A person who causes injury becomes a debtor on the date of the injury-causing incident, even if the amount of the debt is indefinite until an award is made. (*Schwartz v. Brandon* (1929) 97 Cal.App. 30, 37-38.) The inverse is true as well: someone injured by another's tort "becomes a creditor when the cause of action accrues," even before legal action is taken. (*Chalmers v. Sheehy*, *supra*, 132 Cal. at p. 465. See Civ. Code, § 3430 [a creditor is one who "is, or may become, entitled to the payment of money"].) A money

judgment is "no more than a judicial determination of the validity of [an] existing claim." (*Adams v. Bell* (1936) 5 Cal.2d 697, 701.)**3**

Nothing in the Probate Code suggests a legislative intent to disrupt the settled rule that a debt is incurred when a tort is committed. In the context of administering decedents' estates, a "debt" means "a claim" (§ 11401) and a claim means a demand for payment arising in contract or tort, whether due or not due, accrued or not accrued, contingent, liquidated or unliquidated. (§ 9000, subd. (a)(1).) Thus, under the Probate Code, an unresolved tort claim is a "debt." With regard to conservatees, the Supreme Court has acknowledged that "debts" include tort, quasi-contractual and contractual obligations. (*Board of Regents v. Davis* (1975) 14 Cal.3d 33, 42-44 [interpreting the predecessor statute to § 2430].)

Our conclusion that the Legislature intended for conservatees to be liable for tortious acts is fortified by Civil Code section 41, which states that persons of unsound mind are liable for exemplary damages if they are capable of knowing that the act was wrongful "at the time of the act." This statute underscores that responsibility for punitive damages arises on the date the wrongful act was committed, not when a jury verdict or judgment is rendered. In this instance, Parker tried—and failed—to prove at trial that he suffered from diminished mental capacity due to dementia, alcoholism and diabetes. Thus, the jury believed that Parker knew his act was wrongful "at the time of the act," making him liable for pre-conservatorship wrongdoing under Civil Code section 41.

The conservators maintain that Boothby cannot recover because the jury verdict "makes no mention of when either breach of contract or the tort [breach of fiduciary duty] occurred." It is evident—indeed it is res judicata, in light of the prior appeal—that

---

**3**     Although the cited cases involve fraudulent transfers, the Civil Code statutes are not part of the Uniform Fraudulent Transfer Act (Civ. Code, § 3439 et seq.); rather, they describe "General Principles" regarding the relations between debtor and creditor (Civ. Code, §§ 3429-3434). The rule that the debt arises when the tort is committed has been applied in probate cases elsewhere. (See *Dunn v. Lindsey* (N.M. 1961) 361 P.2d 328, 329; *State v. Smith* (Ariz.App. 1967) 431 P.2d 902, 905.)

the tort occurred and Boothby's claim accrued in 2004, when Parker and Attorney Karasik secretly excluded Boothby from the agreement to develop the Property, to prevent him from profiting from the sale of the condominiums that were to be built. Boothby sued in February 2005, before the conservatorship was created.

The conservators argue that even if the debt for punitive damages was incurred before the conservatorship was created, section 2430 "should not be interpreted so harshly as to mandate payment when to do so would deprive the Conservatee of the 'necessities of life.'"

A review of statutory history indicates that the Legislature once agreed with the conservators' line of reasoning. The Probate Code formerly applied the "necessaries of life" exception to debts incurred either before or after creation of the conservatorship. (Former § 1858; *Stevenson v. Superior Court* (1970) 9 Cal.App.3d 904, 906-907 [stating that former § 1858 excepts the necessaries of life from the payment of debts incurred before creation of the conservatorship].)[4] When section 2430 was enacted, addressing the same subject, the Legislature dropped the "necessaries of life" exclusion for debts incurred *before* creation of a conservatorship (§ 2430, subd. (a)(1)), but kept the exclusion for debts incurred *during* the conservatorship (§ 2430, subds. (a)(2), (b)).

We must presume that the Legislature purposefully removed an advantage previously conferred on conservatees, which worked to the disadvantage of creditors. The repeal of a prior statute together with enactment of a new law on the same subject,

---

[4]    Former section 1858 read, "The conservator shall pay . . . any debts incurred by the conservatee before creation of the conservatorship; and he shall pay any debts incurred by the conservatee after the creation of the conservatorship, except that ability to continue to provide the conservatee with the necessaries of life, out of the estate, shall not be impaired. The conservator shall pay debts incurred by the conservatee during the conservatorship for the necessaries of life, and . . . shall pay any other debts incurred by the conservatee during the conservatorship only if they appear to be such as a reasonably prudent person might incur. The conservator may petition the court for instructions when there is doubt whether a debt should be paid." Former section 1858 was repealed in 1979. (Stats. 1979, ch. 726, § 2, p. 2334.)

with deletions, strongly suggests that the Legislature intended to change the law. (*People v. Mendoza* (2000) 23 Cal.4th 896, 916; *People v. Valentine* (1946) 28 Cal.2d 121, 142.) A legislative intent to change the law is presumed where one statute is repealed and another statute with different wording is enacted on the same subject. (*Garcia v. Sterling* (1985) 176 Cal.App.3d 17, 21.) If the Legislature intended to exempt all indebtedness that impairs payment for the conservatee's living expenses, it could have reenacted the wording in former section 1858. We cannot rewrite section 2430 to confer protection by judicial fiat for conservatees' assets after the Legislature removed that protection.

Finally, the conservators rely on section 2404, but it does not apply here. Section 2404 authorizes the probate court to order a conservator to furnish a conservatee with comfortable and suitable support in the event that the conservator fails, neglects, or refuses to do so. There is no claim or evidence that the conservators failed, neglected or refused to furnish suitable support to Parker, and we decline to speculate whether this may occur at some unknown time in the future. The only thing that is certain at this point is that Parker breached his fiduciary duty to Boothby in 2004, he incurred a debt to Boothby at that time, and the conservators must pay Parker's pre-conservatorship debt to Boothby under section 2430.

## DISPOSITION

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION</u>.


BOREN, P.J.

We concur:


CHAVEZ, J.                          FERNS, J.*

_____

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.