NOT DESIGNATED FOR PUBLICATION

No. 120,033

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of

THELMA J. TAYLOR.


MEMORANDUM OPINION

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed October 18, 2019. Affirmed in part, reversed in part, and remanded with directions.

*John W. Fresh*, of Farris & Fresh Law Office, of Atchison, for appellant Laura Kelly.

*Patrick E. Henderson*, of Henderson Law Office, of Atchison, for appellee Boys and Girls Club.

Before BRUNS, P.J., LEBEN, J., and BURGESS, S.J.

PER CURIAM: Thelma J. Taylor died testate on November 18, 2015. In Taylor's will, Laura Kelly (formerly known as Laura Pennington) was designated the executor of Taylor's estate. Kelly claimed as her own cash that was located in a safe deposit box that was held in joint tenancy with Taylor. The residuary beneficiary disagreed. At the hearing for final settlement, the district court found that Kelly was not a joint tenant in the contents of the safe deposit box, nor did Taylor gift Kelly the contents inter vivos. The district court found Kelly converted the $11,000 and ordered her to pay double the conversion amount into the estate pursuant to K.S.A. 59-1704, which requires a double penalty for the conversion of personal property of a decedent. The district court's finding that Kelly was not a joint tenant in the contents of the safe deposit box is affirmed and the imposition of the double penalty is reversed.

1

FACTUAL AND PROCEDURAL BACKGROUND

Taylor was a resident of Atchison County, Kansas, when she passed away in 2015. Taylor executed a will three months prior to her death and named Kelly as the executor. Kelly was a friend of Taylor's. Article II of the will states:

"I intend that there will be in existence at the time of my demise a separate writing bequeathing certain items of tangible personal property to individuals who will be named in that writing, which I hereby incorporate as part of this Will, as is permitted by Kansas law. In the event that there are two or more inconsistent lists in existence at the time of my death, I direct that the latest list in point of time shall control."

The "separate writing" described in Article II was never prepared or located, and this fact is not disputed by the parties. Also of relevance is Article III, which states:

"All the rest, residue and remainder of my property and estate, both real and personal, of whatsoever kind and wheresoever situated, which I own or am entitled to dispose of at the time of my death, shall be disposed of as follows:
"My Executor shall have absolute discretion to distribute any personal property not disposed of by the Memorandum referenced to in Article II or to sell all remaining property and add to the residue of my estate which shall then be paid in its entirety to the Boys and Girls Club of Atchison, Kansas."

In December 2015, before submitting Taylor's will to probate, Kelly held a sale of Taylor's personal property. Kelly did not keep any receipts or accounting for any of the property sold. Kelly also kept or gave away other items of Taylor's personal property for free.

Three months after Taylor's death, and two months after the estate sale, on February 17, 2016, Kelly filed a petition to admit Taylor's will to probate. The will was

2

admitted to probate two months later, on April 15, 2016. Kelly also submitted a petition for allowance and classification of demand which was denied.

Prior to July 22, 2016, testimony was presented that indicated Kelly held property she believed was jointly owned between herself and Taylor. This property was not included in the original inventory and valuation submitted by Kelly. The Boys and Girls Club filed a motion for a supplemental inventory based on this testimony and the district court ordered Kelly to submit a supplemental inventory. Kelly submitted an amended inventory and valuation of Taylor's property, which included the items Kelly believed to be jointly owned, including $11,000 in cash which was located in Taylor's safe deposit box.

On October 11, 2016, the district court found that the "clear intent" of Article III of Taylor's will was that any remaining property not disposed of by Article II "would be disposed of in a manner that would add proceeds to the residuary beneficiary, the Boys and Girls Club of Atchison." The district court further found that all personal property should be accounted for by Kelly and all property should be disposed of "consistent with the charitable intent of Article III" and either given to the Boys and Girls Club or sold and the proceeds presented to the Boys and Girls Club. The district court held that Kelly did not have the discretion to give away personal property of value, or distribute money, when the intent of Taylor was to have the residuary benefit the Boys and Girls Club of Atchison.

Kelly submitted a petition for final settlement on June 29, 2017, and a hearing was held seven months later, on January 31, 2018. At the hearing, Kelly testified that Taylor and herself were joint tenants in a safe deposit box at a bank. Kelly added that when she signed the joint tenancy paperwork, Taylor gave her a key to the safe deposit box. Kelly testified that Taylor "[s]omewhat" discussed the contents of the box, but Kelly knew there was cash in the box. Kelly and Taylor accessed the box together at least two times.

3

Kelly testified that Taylor made no restrictions or limitations on her access to the safe deposit box and Kelly believed she was the owner of the contents of the box. At the hearing, Kelly's attorney also argued that by creating a joint tenancy, Taylor also made an inter vivos gift to Kelly of the contents of the safe deposit box.

One month later, on March 2, 2018, the district court held that Kelly failed to establish that an inter vivos gift was made by Taylor. The district court reasoned: "The giving of a key to a safe deposit box does not show that [Kelly] was given dominion or control over the contents of the box." The district court held that Kelly failed to establish the contents of the safe deposit box were jointly owned by her and Taylor and, therefore, Kelly wrongfully converted the contents. The district court also found that Kelly breached her duties as the personal representative of Taylor.

The district court ordered Kelly to pay $22,000 into the estate, pursuant to K.S.A. 59-1704. A couple of weeks later, Kelly submitted a motion to alter or amend judgment for a new trial. A hearing was conducted on August 1, 2018, and the district court denied Kelly's motion after finding that she presented no new evidence.

Kelly timely filed this appeal.

DID THE DISTRICT COURT PROPERLY CONSTRUE THE WILL?

On appeal, Kelly argues that the district court erred when it construed Taylor's will to be for the sole benefit of the Boys and Girls Club. Kelly argues that the will gave her the "absolute discretion" to distribute Taylor's property as she deemed appropriate.

The interpretation and legal effect of a will are matters of law over which an appellate court exercises unlimited review. *In re Estate of Haneberg*, 270 Kan. 365, 371, 14 P.3d 1088 (2000).

4

The primary function of a court when interpreting a will is to ascertain the testator's intent. If the testator's intent can be ascertained from clear and unambiguous language in the will, the testator's intent must be carried out unless contrary to settled principles of law or public policy. If the testator's intent cannot be ascertained based on ambiguous language in the will that is indefinite or conflicting, the court must apply rules of construction to determine its effect. 270 Kan. at 371-72. According to the Kansas Supreme Court:

> "The critical test in determining whether a will is ambiguous is whether the intention of the testator can be gathered from the four corners of the instrument itself. If so, ambiguity does not exist. If the testator's intent can be ascertained, neither rules of construction nor extrinsic evidence should be allowed to vary the clear intent expressed on the face of the instrument. [Citation omitted.]" 270 Kan. at 371.

There is no dispute that the separate writing referenced in Article II of Taylor's will could not be located. Because a separate document was not located and because no other article in the will speaks to the distribution of property, the residuary clause of Article III controls.

Both parties agree that Article III of the will is unambiguous. That said, the parties submitted different interpretations of the terms of Article III, and neither party examined Taylor's will in its entirety.

Relying on the specific language in Article III stating that Kelly "shall have absolute discretion to distribute any personal property" not disposed of in Article II, Kelly argues that Taylor intended for Kelly to do whatever she wanted with any of the estate property. Apart from the language of Article III, Kelly offers no additional support for this interpretation.

The language of Article III read in isolation suggests that Kelly had two options for the residuary personal property. First, Kelly could "distribute" any of the personal property not yet disposed of by Article II. Second, Kelly could "sell all remaining property" and add the revenue to the residue of the estate, which would then be paid in its entirety to the Boys and Girls Club of Atchison.

Kansas law requires a court to review a will in its entirety in order to ascertain the testator's intent. 270 Kan. at 371 (holding the "critical test" for determining if a will is ambiguous is whether the intent of the testator can be determined from the four corners of the will). Kelly's interpretation of Taylor's will is contrary to the plain and unambiguous language when the will is read in its entirety. Specifically, Article IV addresses the intent of Taylor in the event that none of the persons designated in a separate writing pursuant to Article II are living. Article IV states:

> "If upon my death, none of the persons to whom my estate is directed to be distributed
> are living, my personal representative, shall distribute one hundred (100%) percent of the
> [*sic*] in accordance with Article III herein or to such charitable agency as my Executor
> deems appropriate in their absolute discretion should the Boys and Girls Club of
> Atchison, Kansas no longer exist at the time of my death."

When considering the language of Article IV in conjunction with the language of Article III, the charitable intent of Taylor's will is clear. While Article IV was not operative due to a lack of any designation of any recipient pursuant to Article II, it is very informative as the court reviews Taylor's intent via the four corners of the will. See 270 Kan. at 371.

Article IV supports the district court's conclusion that Taylor intended for any personal property not distributed pursuant to Article II was to be distributed to a charitable organization—the Boys and Girls Club of Atchison. When viewed in isolation, Kelly's interpretation of Article III may be correct, but that interpretation is not consistent

6

with Taylor's intentions when the will is read in its entirety. The district court did not err when it determined that all personal property not disposed of by Article II should be disposed of consistent with the charitable intent of Article III.

## DID TAYLOR CREATE AN INTER VIVOS GIFT OF THE CONTENTS OF THE SAFE DEPOSIT BOX?

Kelly challenges the district court's determination that Taylor was the sole owner of the cash found in the safe deposit box at the time of her death. Kelly argues that Taylor created an inter vivos gift of the cash and, therefore, she could not be found guilty of conversion.

To establish a valid gift inter vivos, there must be "(a) an intention to make a gift; (b) a delivery by the donor to the donee; and (c) an acceptance by the donee." *In re Estate of Matthews,* 208 Kan. 492, 505, 493 P.2d 555 (1972). "The burden of proving that a gift was made, including the existence of all the elements necessary to its validity, is upon the party asserting the gift." *Truax v. Southwestern College*, 214 Kan. 873, Syl. ¶ 3, 522 P.2d 412 (1974).

The determination of whether the monies located in the safe deposit box were a gift is a question of fact. *In re Estate of Button*, 17 Kan. App. 2d 11, 13, 830 P.2d 1216 (1992). The Kansas Supreme Court has reasoned:  "There cannot be any doubt that the elements of intent, delivery and acceptance are usually questions of fact to be determined by the [district court]." *Hudson, Administrator v. Taylor*, 188 Kan. 202, 211, 361 P.2d 878 (1961). On appeal, our court "must determine if the findings are supported by substantial competent evidence and whether they are sufficient to support the trial court's conclusions of law." *Army Nat'l Bank v. Equity Developers, Inc.*, 245 Kan. 3, 19, 774 P.2d 919 (1989).

7

Here, the district court found that Kelly did not meet her burden of proof, resulting in a negative finding. Our Supreme Court has held that a negative finding requires a special standard of review:

> "The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976).

Kelly also attempts to shift the burden of proof onto the Boys and Girls Club by citing caselaw that provides the burden of proving a claim against a decedent's estate is on the claimant. See *In re Estate of Brown*, 189 Kan. 193, 198, 368 P.2d 27 (1962). However, this is not the issue here. It is well settled that the burden of proving an inter vivos gift was made is on the party asserting the gift. *Truax*, 214 Kan. 873, Syl. ¶ 3. Kelly is asserting that an inter vivos gift was made and, thus, has the burden of proof.

Kelly argues that the creation of the joint tenancy in the safe deposit box created a joint tenancy in the contents of the safe deposit box which was an inter vivos gift from Taylor to Kelly. Kelly argues the facts created both a joint tenancy in the contents and an inter vivos gift because the creation of a joint tenancy satisfies the "delivery" element required to establish an inter vivos gift.

*Kelly was not a joint tenant in the contents of the safe deposit box.*

It is clear from the record that the safe deposit box lease created a joint tenancy in the box itself. However, the safe deposit box lease specifically states: "Nothing in this paragraph, however, will determine or affect the ownership of the contents of the safe

8

deposit box or preclude any statutory right of access to the safe deposit box upon the death of a lessee." Kansas caselaw has also found that a joint tenancy of a safe deposit box at a bank does not necessarily create a joint tenancy in its contents. See *In re Estate of Snyder*, 188 Kan. 322, 324-25, 362 P.2d 651 (1961) (finding securities were separate property of wife even though they were located in safe deposit box where wife and husband were joint tenants with right of survivorship). Thus, Kelly needed to prove she had a joint tenancy in the *contents* of the safe deposit box.

By denying Kelly's argument that Taylor made her an inter vivos gift, the district court also denied the claim that a joint tenancy was created in the contents of the safe deposit box—a negative finding. On appeal, Kelly does not argue the district court arbitrarily disregarded undisputed evidence, nor does she argue any bias, passion, or prejudice by the district court. Therefore, the negative finding by the district court cannot be disturbed. See *Highland Lumber Co.*, 219 Kan. 366, Syl. ¶ 5.

That said, an independent review of the facts under a substantial competent evidence standard supports the district court's conclusion that a joint tenancy in the contents of the safe deposit box was not created. Our Supreme Court has recognized:

> "'Under common law, "four unities" had to be present to create a joint tenancy: (1) interest—the tenants must have one and the same interest; (2) title—the interests must accrue by one and the same instrument or conveyance; (3) time—the interests must commence at one and the same time; and (4) possession—the property must be held by one and the same undivided possession. If any one of these unities is lacking, the estate is not one in joint tenancy. *Simonich, Executrix v. Wilt*, 197 Kan. 417, 421, 417 P.2d 139 (1966).'" *Robertson v. Ludwig*, 244 Kan. 16, 19, 765 P.2d 1124 (1988).

Although the Kansas Supreme Court has held that a joint tenancy in personal property can be created by an oral contract, the provisions of K.S.A. 58-501 "require that the terms of such contract clearly disclose that a joint tenancy was intended to be

9

established." *In re Estate of Carlson*, 201 Kan. 635, 643-44, 443 P.2d 339 (1968) (finding that the provisions of K.S.A. 58-501 do not preclude proof by oral evidence of an oral joint tenancy contract, but instead requires the terms clearly disclose a joint tenancy was intended).

There is insufficient evidence to prove Taylor *clearly* intended to create a joint tenancy in the contents of the safe deposit box. Kelly argues the first element—interest, set forth in Robertson—was created when the title to the safe deposit box was placed in joint tenancy and a separate key was delivered to Kelly. This argument is not persuasive. There could be numerous reasons why Kelly was given access to the safe deposit box such as convenience in assisting Taylor manage her personal property during her life or providing Kelly easier access to the box upon her death. The terms of the safe deposit box lease agreement, and Kansas caselaw, both suggest that although there was a joint tenancy in the box itself, ownership of the contents can be held separately. See *Snyder*, 188 Kan. at 323-24.

Kelly does not make any arguments for how the other three elements stated in *Robertson* were satisfied. The record on appeal suggests that substantial competent evidence—or lack thereof—supports the district court's determination that a joint tenancy did not exist. In her brief on appeal, Kelly states that Taylor told her she was to have the contents of the safe deposit box, but Kelly fails to designate where in the record this claim was raised in the district court.

The remaining evidence Kelly relies on to support her argument is thin. Kelly testified that she was only "[s]omewhat" aware of the contents of the safe deposit box, but she did know the box contained cash. Kelly testified that Taylor gave her a key to the safe deposit box and that Taylor never made any restrictions or limitations on Kelly's ability to access or take things out of the box. However, when a verdict or trial court decision is challenged for insufficiency of evidence or as being contrary to the evidence,

10

an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

Based on the requirement of establishing a clear intent to create joint tenancy in personal property and our court's inability to reweigh evidence, the district court's determination that a joint tenancy was not created is affirmed.

*Taylor did not create an inter vivos gift of the contents of the safe deposit box.*

Having established that no inter vivos gift was completed by the creation of a joint tenancy in the safe deposit box, there is no other evidence of the completion of an inter vivos gift. The district court held that Kelly failed to meet her burden of proving an inter vivos gift, which created a negative finding by the district court. Kelly does not make any attempt to argue a disregard of undisputed evidence and does not claim any extrinsic consideration such as bias, passion, or prejudice. See *Highland Lumber Co.*, 219 Kan. 366, Syl. ¶ 5 (establishing the standard of review for a negative finding). Rather, Kelly argues, generally, that the district court's determination that an inter vivos gift was not created was "not supported by the evidence."

Our court does not reweigh evidence or pass on credibility of witnesses when a district court's decision is challenged as being contrary to the evidence. *Duckworth*, 293 Kan. at 407. When viewed in the light most favorable to the prevailing party—the Boys and Girls Club—the evidence supports the verdict and, therefore, it cannot be disturbed on appeal.

The lack of evidence presented is identical to the lack of evidence presented to create a joint tenancy. Kelly presents no evidence to support the first factor of intent to

11

make a gift. She only states that it was "clearly Ms. Taylor's intention to make a gift of the contents of the safe deposit box." This is insufficient to challenge the district court's determination below.

Kelly also attempts to argue that the second element—delivery—was satisfied when Taylor created a joint tenancy in the consents and gave Kelly a key to the safe deposit box. However, as previously determined, a joint tenancy was not created in the contents of the box, and the district court found: "The giving of a key to a safe deposit box does not show that the executrix was given dominion or control over the contents of the box."

The final element—acceptance—was established by Kelly when she took the contents of the safe deposit box and testified that she believed she owned the contents within the box. This alone, however, is insufficient to establish an inter vivos gift.

A review of the issue under a negative findings standard of review, as well as when reviewed for substantial competent evidence, supports the district court's determination that Kelly failed to establish an inter vivos gift in the contents of the safe deposit box. The district court properly concluded that Kelly wrongly converted the contents of the box. See *In re Conservatorship of Marcotte*, 243 Kan. 190, 194, 756 P.2d 1091 (1988) (defining "[c]onversion as the unauthorized assumption or exercise of a right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights").

IS KELLY SUBJECT TO THE PENALTY PROVISIONS OF K.S.A. 59-1704?

Kelly argues the district court erred when it found she violated the provisions of K.S.A. 59-1704 because Kelly was not acting as executor of Taylor's estate at the time she converted the cash from the safe deposit box.

12

Kelly's argument rests on the fact that at the time of the conversion of the contents of the safe deposit box: (1) Taylor's will had not yet been admitted to probate and, (2) Kelly had not yet been appointed by the court to act in any fiduciary capacity and, therefore, it was error for the district court to find her liable for the double penalty.

K.S.A. 59-1704 states: "If any person embezzles or converts to his or her own use any of the personal property of a decedent or conservatee, such person shall be liable for double the value of the property so embezzled or converted." Here, the district court found that this statute was applicable to the facts of this case, regardless of Kelly's good faith intentions, and ordered her to pay $22,000 back into Taylor's estate.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

> "Our Supreme Court in *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 401-03, 507 P.2d 189 (1973), recognized 59-1704 as a civil, not a criminal, statute and held the penalty imposed thereunder is a redress of a civil wrong and not a fine. . . . This holding requires that K.S.A. 59-1704 must be strictly rather than broadly construed." *Bolton v. Souter*, 19 Kan. App. 2d 384, 388, 872 P.2d 758 (1993).

Our court addressed the legislative history of this statute in *In re Trusteeship of McDonald*, 16 Kan. App. 2d 293, 295, 822 P.2d 637 (1991):

> "Prior to legislative change in 1939 (L. 1939, ch. 180, § 134), when the now-pertinent provisions of K.S.A. 59-1704 were enacted, G.S. 1935, 22-912 had provided that:
> > "'If any executor or administrator shall neglect to sell any portion of the personal property which he is bound by law to sell, and retains, consumes or disposes of the same for his own benefit, he shall be charged therewith at double the value affixed thereto by the appraisers.'

13

"Thus, the earlier statutory double liability for conversion provision was, on its face, applicable to executors and administrators. In contrast, K.S.A. 59-1704 directs the imposition of double liability upon 'any person' who has engaged in the conduct proscribed, that is, conversion of 'personal property of a decedent or conservatee.'"

In *McDonald*, our court agreed with the district court's determination that the funds at issue were not "personal property of a decedent," as required by K.S.A. 59-1704, but the issue of who is "any person" was not discussed. See 16 Kan. App. 2d at 296.

Our court addressed this issue a few years later in *Bolton* and held that the statute was not applicable "when the transferor was not a conservatee at the time of the transfer nor was the transferee his conservator or under the control of the district court at the time the transferee received dominion over the transferor's property." 19 Kan. App. 2d 384, Syl. ¶ 6. Our court reasoned:

"K.S.A. 59-1704 is a part and portion of the Kansas Probate Code. We hold it is improper to widely apply its provisions to instances where the involved individual is not an appointee of the district court and the assets in question are not under the control of a court-appointed conservator, executor, or administrator." 19 Kan. App. 2d at 391.

Kelly relies on this quote from *Bolton* to make her argument that the district court erred when it ordered her to pay $22,000 under K.S.A. 59-1704. Kelly argues that she was not an appointee of the district court at the time of the conversion of the contents of the safe deposit box, and the assets in question were not under the control of a court-appointed conservator, executor, or administrator.

The Boys and Girls Club argues that "some of the dicta [in *Bolton*] is unnecessarily complicated" and "[a] rigid following of the dicta in *Bolton* . . . is bad policy and could lead to unjust results." The Boys and Girls Club believes that a rigid following of *Bolton* would narrow the statutory phrase "any person" to only apply to

14

those who have been appointed by a court in a fiduciary capacity, which is contrary to the language of K.S.A. 59-1704.

From our research, it appears *Bolton* is the only case that directly addresses the issue when a person converts property of a decedent before being appointed by the court. However, the Boys and Girls Club points to *Martin v. Hanschu*, 241 Kan. 521, 738 P.2d 96 (1987), to argue that the Kansas Supreme Court has generally considered the issue.

In *Martin*, the decedent's wife, Hanschu, converted estate property for her own use before she was appointed as the administrator of the estate. After she was appointed, Hanchu posted a surety bond provided by Trinity Universal Insurance Company (Trinity). The district court found that K.S.A. 59-1704 applied and ordered Hanschu to pay a double penalty but found the statute was not applicable to Trinity.

The estate appealed the district court's decision finding K.S.A. 59-1704 inapplicable to Trinity. The sole issue on appeal to the Kansas Supreme Court was "whether a surety on an administrator's bond may be held liable for assets converted before the issuance of a bond and/or prior to the appointment of an administrator." 241 Kan. at 523. Our Supreme Court found that the wording of the bond limited the insurance company's liability, and held:

> "Under the agreement, if . . . Hanschu faithfully discharges the duties of her trust
> according to law, then Trinity has no liability; otherwise, Trinity is liable. . . . Hanschu
> had no duties of trust until she qualified as administratrix. Accordingly, we hold Trinity is
> not liable for the conversion or misappropriation of funds by . . . Hanschu occurring prior
> to her appointment as administratrix and prior to the filing of a bond." 241 Kan. at 524.

The Boys and Girls Club attempts to use this case to support its argument that Kelly is liable under K.S.A. 59-1704. According to the Boys and Girls Club, this decision

15

was correct because Hanschu was the person who converted the personal property and, therefore, any penalty for the conversion is appropriate only for her.

This argument is unpersuasive when viewed in conjunction with *Bolton*. *Bolton* was decided a few years after *Martin* and *Bolton* specifically addresses the issue presented here. The wife in *Martin* did convert estate property before she was appointed as administrator and was ordered to pay double under K.S.A. 59-1704, but this was not the issue heard before the Kansas Supreme Court. The *Martin* decision has no impact on the effect of *Bolton* where our court held it was improper to apply the double penalty in instances where the individual is not an appointee of the district court.

An unlimited review of K.S.A. 59-1704 and applicable caselaw provides that the district court erred when it ordered Kelly to pay $22,000 under K.S.A. 59-1704. The statute should be strictly construed and our court should be hesitant to apply it liberally. See *Bolton*, 19 Kan. App. 2d at 388. We reverse the imposition of the double penalty and remand to the district court to impose an appropriate penalty of $11,000 to be paid back into the estate. See *In re Estate of Engels*, 10 Kan. App. 2d 103, 109, 692 P.2d 400 (1984) (reversing and remanding to the district court with orders to impose the penalty under K.S.A. 59-1704).

The decision of the district court finding that Kelly had no claim to the $11,000 found in the safe deposit box is affirmed. The imposition of the double penalty is reversed and we remand to the district court to impose an appropriate penalty of $11,000 to be paid back into Taylor's estate.

Affirmed in part, reversed in part, and remanded with directions.

16

LEBEN, J., concurring in part and dissenting in part: After Thelma Taylor died, Laura Kelly took $11,000 from Taylor's safe-deposit box. Kelly had a key to the box, but the funds weren't hers.

The district court ordered that Kelly pay the $11,000 back to Taylor's estate and also that she pay what amounts to an $11,000 penalty. The court did so because a Kansas statute, K.S.A. 59-1704, plainly requires it: "If any person embezzles or converts to his or her own use any of the personal property of a decedent or conservatee, such person shall be liable for double the value of the property so embezzled or converted."

To interpret any statute, of course, we start with its words. This one applies "if" three elements are met:

| Who | Action | Thing Acted Upon |
| --- | --- | --- |
| "any person" | "embezzles or converts to his or her own use" | "any of the personal property of a decedent or conservatee" |

And those elements are met here. Kelly is a person. She took the cash and converted it to her own use. And the cash was among the personal property left behind by Taylor after her death.

Once those elements are met, the statute provides that "such person" (here, Kelly) "shall be liable for double the value of the property so embezzled or converted." K.S.A. 59-1704. That means the person must pay the money back and pay an equal amount—as a penalty—for taking advantage either of a person who has died or a person whose property is in a conservatorship. In both of those cases, the person (either dead or unable to care for their own property) is especially vulnerable to abuse. So the Legislature has

provided a penalty to discourage abuse. Here, the district court ordered that Kelly pay the estate $22,000. That's exactly what the statute requires.

So what is Kelly's argument on appeal against this? She makes two points. First, she argues that "K.S.A. 59-1704 is to be strictly construed given the penal nature of the statute." Second, she cites our court's 1993 decision in *Bolton v. Souter*, 19 Kan. App. 2d 384, 872 P.2d 758 (1993), which does generally support Kelly's position. But we must determine whether either the strict-construction rule for penalty statutes or our court's decision in *Bolton* can override the statutory language here.

Kelly's first point is a call to apply the rule of lenity, under which ambiguities in statutes defining a crime or imposing a penalty are resolved in the defendant's favor. See Scalia & Garner, Reading Law: The Interpretation of Legal Texts § 49 (2012). But "there must be a *reasonable* doubt as to a criminal statute's meaning before the rule of lenity comes into play." *State v. Coman*, 294 Kan. 84, 97, 273 P.3d 701 (2012). This isn't a criminal statute, but the same rule applies here. See *Radke Oil Co. v. Kansas Dept. of Health & Environment*, 23 Kan. App. 2d 774, Syl. ¶ 2, 936 P.2d 286 (1997) (applying rule of lenity to civil penalty statute); Scalia & Garner § 49 (noting the rule's application to both statutes defining crimes and ones imposing a penalty). If anything, the rule of lenity is strongest in criminal cases, but even in criminal cases *Coman* makes clear that the rule has no application absent ambiguity. There's no ambiguity in this statute, so we don't turn to the rule of lenity.

With that established, the *Bolton* case, which relied on the rule of lenity, is of little help. *Bolton* also had rather unique facts not found here—the money that was taken had first been given by Bolton, an elderly man, to a woman named Velda Souter (before the conservatorship was formalized) so that there'd be a readily available emergency fund he could tap without contacting the conservator. After some time had passed, and the court

18

had established the conservatorship, Souter refused to return the funds to Bolton or the conservator.

Our court decided the penalty provision of K.S.A. 59-1704 didn't apply in *Bolton* for two reasons. First, the court said it was required to give the statute a strict construction because it was a penal statute. Second, on the facts of *Bolton*, it appeared that Bolton and Souter could "be characterized as . . . coconspirators" who were jointly trying "to thwart the effect of an expected conservatorship." 19 Kan. App. 2d at 390.

When applying the strict-construction principle of the rule of lenity, the *Bolton* court noted that K.S.A. 59-1704 was part of the Probate Code and that the funds had been transferred before the Probate Code conservatorship had been established by court order. 19 Kan. App. 2d at 391. Kelly argues that she too took funds before she accepted appointment from the probate court as Taylor's executor. But there are two problems with applying *Bolton* here. It had unique facts—the apparent coconspirator relationship between the elderly conservatee and the woman he gave money to for an "emergency fund" outside the conservatorship. And even if it weren't clear in 1993 when *Bolton* was decided, no rule of strict construction should have been applied unless the court first found an ambiguity.

Perhaps there was an ambiguity in applying the statute in *Bolton* based on the coconspirator relationship. But there's no ambiguity in applying the statute to our case. And there's nothing magical about its placement within the Probate Code. The statute had to go somewhere, and it's logical to look for a statute about the funds of a decedent there. Even so, nothing in the language of K.S.A. 59-1704 limits its application only to funds of the decedent that are taken *after* a probate proceeding has begun. That sort of limitation would be a huge loophole in a statute meant to protect a person's assets from theft or abuse after death.

19

I join the court's opinion except for its treatment of K.S.A. 59-1704; that statute unambiguously applies here. So I would fully affirm the district court's judgment, and I therefore dissent from the court's refusal to apply K.S.A. 59-1704 under these facts.